## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC., | : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :     C.A. No. 03-241 JJF <br> : |
| CANON, INC., CANON U.S.A., INC., *et al.*, | : <br> : |
| Defendants. | : |

### SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON MOTION OF ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC. FOR SANCTIONS AGAINST THE CANON DEFENDANTS;

### SANCTIONS RECOMMENDED[1]

This matter comes before me, as Special Master, on the motion of plaintiff St. Clair Intellectual Property Consultants, Inc. ("St. Clair") for the imposition of sanctions against defendants Canon, Inc. and Canon U.S.A., Inc. (collectively, "Canon"), and/or their counsel.

The Special Master recommends that St. Clair's motion for sanctions against Canon be **GRANTED,** as set forth herein.

### BACKGROUND

This is a patent infringement case[2] brought by St. Clair against multiple defendants, including Fuji Photo Film Co. Ltd., Fuji Photo Film U.S.A., Inc., and Fuji Film America, Inc. (collectively, "Fuji") and Canon.[3] The issue of Canon's infringement has been tried to a separate

---

[1]  The Special Master's Report and Recommendations herein are based upon the parties' written submissions, with neither party having requested an evidentiary hearing and the Special Master having determined based upon the written submissions that oral argument is unnecessary.

[2]  The patents-in-suit are United States Patent Nos. 5,138,459; 6,094,219; 6,233,010; and 6,323,899.

[3]  At the time the suit commenced, camera manufacturers Casio, Epson, Kyocera, Minolta, Nikon, Olympus and Seiko Epson were also named as defendants. As a result of prior settlements, none of these are implicated in St. Clair's motion for sanctions.

jury, which returned a verdict of $34.7 million in favor of St. Clair. D.I. 880. For reasons that will be explained later herein, the verdict has not been reduced to final judgment.

## The Ownership Defense

Among the matters pending before the Court is an "ownership defense" that asserts St. Clair, as assignee of the inventors, does not have standing to sue for infringement because the patents-in-suit were invented during the course of the inventors' employment with Mirage Systems, Inc. ("Mirage") and are rightfully the property of Mirage. Mirage is not a party to the litigation, but is an indisputably critical fact witness with respect to the ownership defense.[4]

Canon developed the legal arguments that support the ownership defense, with factual support provided by employees of Mirage. Based on those arguments, Canon filed a motion to dismiss St. Clair's complaint arguing that St. Clair lacks standing to prosecute, and the Court lacks subject matter jurisdiction over, this patent infringement action because Mirage rather than St. Clair owns the patents-in-suit (the "Ownership Defense Motion"). D.I. 612-13. Canon supported its Ownership Defense Motion with declarations provided by Mirage employees. D.I. 614-16. Fuji filed a one-page motion to join in the Ownership Defense Motion filed by Canon. D.I. 604.

Upon its consideration of the Ownership Defense Motion, the Court declined to summarily dismiss St. Clair's claims, denied the Ownership Defense Motion, D.I. 812, and scheduled issues raised by the ownership defense for trial on the merits set to follow the infringement trial against Canon.

---

[4] In their papers, the parties sometime refer to this as the "standing defense" and, therefore, refer to what has been designated the "Ownership Defense Motion" herein as the "Standing Motion" instead. Irrespective of the terms used, the Special Master and parties are referring to the motion papers filed by Canon that are docketed at D.I. 612-13.

062038.00610/40156788v.1

## The Canon/Mirage Consulting Agreement

On September 30, 2004, during the infringement trial against Canon, the Court and St. Clair learned for the first time of the existence of a previously undisclosed agreement between Canon and Mirage. According to the affidavit submitted by St. Clair's counsel, Becky Thorson, Canon's counsel handed a copy of an agreement to her during a recess that followed the close of St. Clair's case-in-chief, as Mirage employee George Moussally was about to take the stand for Canon. The Agreement, entitled The Consulting Agreement and Covenant Not to Sue, is by and between Canon and Mirage and is dated April 30, 2004 (the "Consulting Agreement").

Under the terms of the Consulting Agreement, Mirage agrees *inter alia* not to sue Canon for infringement in the event that Canon succeeds in establishing Mirage as the owner of the patents-in-suit, in exchange for lump sum payment of $75,000 from Canon to Mirage within five days after execution of the Agreement. The Consulting Agreement further provides that Mirage "shall cooperate and provide assistance to Canon" in determining whether Mirage has ownership of or rights in the patents-in-suit. Specifically:

> **Mirage shall cooperate and provide assistance to Canon** in determining whether Mirage has ownership or other rights in the Patents and/or the Family of Patents, including, but not limited to, at Canon's request, **searching for and providing necessary documents and records, providing testimony in court and by deposition, locating and identifying additional resources that may aid in establishing Mirage's ownership of the Patents** and/or the Family of Patents, **and any other reasonable efforts** necessary to assist in determining whether Mirage has ownership rights in the Patents and/or the Family of Patents ("Consulting Obligations").

Consulting Agreement ¶ 2.1 (emphasis added) [attached hereto as Exhibit 1]. The Consulting Agreement also provides that Mirage shall be "reimbursed" – with invoicing and payment structured through Canon's counsel – for certain expenses and "lost time" associated with its employees' efforts in fulfilling its Consulting Obligations under the Consulting Agreement:

3

> 6.2    In consideration of the forgoing, Canon further
> agrees to compensate Mirage for its reasonable travel expenses,
> office   expenses   (e.g.,   copying,   postal,   phones)   **and**
> **reimbursement for lost time that may be incurred in**
> **connection with this Agreement.**    Mirage agrees to provide
> invoices and supporting documentation to Canon, c/o Kramer
> Levin Naftolis & Frankel, Attention Donald L. Rhoads, 919 Third
> Avenue, New York, NY 10022, outlining expenses incurred at
> Mirage's actual cost.

> 6.3    **The reimbursement for lost time for any Mirage**
> **employees in connection with this Agreement is $300 per hour.**

Consulting Agreement, Exh. 1 at ¶¶ 6.2-6.3 (emphasis added).    These provisions obligated

Canon to pay to Mirage – a fact witness – the amount of $167,693.97 (the $75,000 lump sum and

$92,693.97 in "lost time" consulting fees) for Mirage's services up to the time the Agreement

came to light on September 30, 2004.[5]

The potential value of the Consulting Agreement to Mirage, however, is conceded to be

much greater.    As admitted by Canon in various of its submissions to the Special Master:

> First, **Mirage, if it obtained patent rights, could pursue many**
> **potential infringers for any amount of damages it saw fit.**
> Second, it was entirely reasonable for Mirage, a small company
> without substantial resources that would be needed in a head-to-
> head battle with St. Clair, **to enter into an arrangement under**
> **which the ownership issue could be raised with minimal cost to**
> **itself.**

Canon's Submission to the Special Master dated January 14, 2005 at p. 4 n.4 (emphasis added).

And:

> Mirage, a small company without substantial resources to fight the
> likes of St. Clair, could **expect its ownership claims to be**
> **developed in the St. Clair/Canon litigation.**    Moreover, **Mirage**
> **remained free, at a later date, to seek licenses from others and**
> **disgorgement by St. Clair of its ill-gotten gains.**

---

[5] An additional $7,892.48 had also been invoiced by Mirage to Canon, as of that date. MRG 305-309.

Canon's Reply (before Special Master) dated January 31, 2005 at p. 1 (emphasis added). Thus, the consulting relationship between Mirage and Canon under the Consulting Agreement was envisioned as the vehicle by which Mirage could establish rights superior to St. Clair in the patents-in-suit at no cost to itself, because Canon would bear the litigation costs as part of its affirmative defense. If successful, Mirage could be found to have rights in patents that, as of September 30, 2004, had been successfully asserted to infringement verdicts in excess of \$60 million, D.I. 880, 926, and *St. Clair Intellectual Property Consultants, Inc. v. Sony Corp., et al.*, C.A. No. 01-557-FFJ (\$25 million verdict), together with settlements in undisclosed amounts.

## Trial Interrupted

Upon learning of the Consulting Agreement, St. Clair immediately brought it to the attention of the Court, moving to strike the ownership defense as a sanction under Fed. R. Civ. P. 37 for Canon's and Fuji's alleged failure to disclose the existence of the Consulting Agreement during discovery. St. Clair argued that it had propounded numerous Interrogatories and Requests for Production on Canon regarding the patents-in-suit, as to which the negotiation, existence, payments made under, and production of the Consulting Agreement would have been responsive.[6] St. Clair's argument continued that, although the Consulting Agreement was executed shortly after the close of discovery, Canon did not supplement its discovery responses as required under Fed. R. Civ. P. 26(e) to disclose information about the Consulting Agreement. D.I. 890 at 829-830:1-12.

The Court then engaged Canon's counsel in a lengthy colloquy to ascertain the factual circumstances of how the Consulting Agreement came into being and why it was not previously disclosed to St. Clair and the Court. D.I. 890 at pp. 830-856. Because Canon was unable to satisfactorily address the Court's questions, the Court severed trial on the ownership defense

---

[6] The discovery sought by St. Clair is discussed in greater detail *infra* at pp. 27-30.

from Canon's infringement trial pending decision on St. Clair's motion to strike. D.I. 890 at 854:23-25 and 855:6-8.

The Court also ordered discovery before the Special Master on the issues of whether the production of the Consulting Agreement and related discovery was timely made and, if not, what if any sanction should be imposed.

## Discovery Under Auspices of Special Master

The additional submissions to and proceedings before the Special Master were not docketed as part of the official record in this case and, therefore, merit summarization and explication for the Court's and the parties' consideration of the Special Master's Report and Recommendations herein.

The discovery ordered by the Court against Canon, Fuji and Mirage proceeded before the Special Master with a focus on the negotiation, creation, drafting, operation and/or ultimate production of the Consulting Agreement. Because both Canon and Fuji asserted attorney-client and/or work product privilege with respect to certain documents and communications responsive to St. Clair's discovery requests, the Special Master – following argument, briefing, and *in camera* review of all communications as to which privilege was asserted – issued, under seal, the "Findings and Order of Special Master on Discovery of Documents and Communications Relating to Consulting Agreement" dated March 15, 2005 (the "March 15, 2005 Special Master's Order").[7]

---

[7] The March 15, 2005 Special Master's Order issued to St. Clair, Canon and Fuji "under seal." Canon notified the Special Master by letter dated April 4, 2005 that it did not agree with various of the "suggestions made and inferences drawn" by the Order, but that it would not take an appeal. Accordingly, Canon did not file an objection to, or seek modification of, the March 15, 2005 Special Master's Order. For the Court's edification, the entire text of that Order is appended hereto as sealed Exhibit 2.

6

As set forth in that Order, the Special Master determined that St. Clair had made a *prima facie* showing that Canon engaged in discovery fraud and/or fraud on the Court by concealing the existence of the Consulting Agreement, and concluded that the attorney-client and work product privileges asserted by Canon were inapplicable and/or had been waived as to communications directed to the negotiation, creation, drafting, operation and/or ultimate production of the Consulting Agreement.   March 15 Special Master's Order, Exh. 2 at p. 37. Therefore, St. Clair was permitted to obtain discovery relating to the Consulting Agreement from Mirage, Fuji and its counsel, and Canon and its counsel, with access to Canon's formerly privileged communications and its attorneys' work product.

## Findings of Fact

Through this discovery, St. Clair developed, and the Special Master finds, the following facts relative to the Consulting Agreement and Canon.[8]   These facts are listed chronologically with certain docketed facts of record, to provide context.

November 15, 2003
  • Canon's counsel contacts Mirage to discuss a subpoena that Canon plans to serve on Mirage.

December 15, 2003
  • As document discovery closes under the Court's Scheduling Order, Canon issues document production subpoenas and depositions notices to 27 third parties, including a subpoena to Mirage to produce documents and appear for deposition on January 15, 2004.

December 23, 2003
  • St. Clair moves for relief from the timing of subpoenas and deposition

---

[8] To enhance readability, the documents and docket entries supporting these findings are not cited herein.  Citations are, however, included whenever these facts are discussed later herein.  If it would be helpful to the Court, the Special Master can provide citation support for the facts recited.

062038.00610/40156788v.1

notices issued by Canon.

January 15, 2004 • Canon's noticed deposition of Mirage does not go forward. The parties agree that it will be rescheduled to a later date.

January 30, 2004 • St. Clair writes to Canon asking for proposed dates and locations for the renoticing of Canon's proposed depositions, expressly referencing the deposition of Mirage.

February 4, 2004 • Canon responds to St. Clair with assurance that "As to the depositions of the third party witnesses referred to in your January 30 letter, we are working on obtaining proposed dates for the depositions and will get back to you when we obtain them."

February 10, 2004 • Canon transmits to St. Clair copies of documents (MIRAGE 00001-186) produced by Mirage in response to the subpoena issued by Canon.

February 10, 2004 • St. Clair writes to Canon again requesting proposed dates and locations for the renoticing of Canon's proposed depositions ("of most urgence is scheduling the remaining depositions in the case . . . We are also awaiting information about the schedule for any depositions you plan to take of witnesses we do not represent.").

February 12, 2004 • St. Clair writes to Canon confirming schedules for a number of depositions, and admonishing "with less than seven weeks left in

8

> discovery, we need to schedule the outstanding depositions
> immediately. Please let me know within the next week . . . ."

February 13, 2004    • Canon responds to St. Clair with confirmation of additional deposition
dates; does not mention any deposition of Mirage.

February 17, 2004    • St. Clair writes to Canon "it is our understanding that you have not set
any dates or locations for the depositions of any third parties . . . it is
imperative that you provide us with ample advance notice of any third
party depositions . . . ."

February 18, 2004    • Canon responds with the schedule for additional depositions; does not
mention any deposition of Mirage.

February 24, 2004    • Canon advises St. Clair of additional deposition scheduling; does not
mention any deposition of Mirage.

Early March, 2004    • Canon's counsel meets with Canon in Japan and suggests entering into
an agreement to purchase Mirage's rights in the patents-in-suit and/or
enlisting Mirage's cooperation and assistance in the litigation.

Early March, 2004    • Canon approves its counsel's idea to enter into an agreement with
Mirage.

March 9-14, 2004    • Counsel for Canon contacts Mirage, informs Mirage of its "rights"
with respect to the patents-in-suit, and proposes a consulting

9

arrangement.

March 12, 2004
- Canon asks that St. Clair stipulate to the authenticity of third party documents, including MIRAGE 00001-186 produced by Mirage, requesting that "If St. Clair is unwilling to enter into such a stipulation, please provide us with dates that St. Clair is available for the depositions of these third parties to the extent they have not previously been scheduled . . . . "

March 12, 2004
- St. Clair moves for a protective order seeking relief from eight depositions noticed by Canon for March 29-30, 2004 – including the rescheduled deposition of Mirage – and seeks permission to reschedule them at a mutually convenient time during April 13-30, 2004, following the scheduled close of discovery on March 30, 2004.

March 17, 2004
- Canon sends e-mail to St. Clair advising its intention to proceed with the noticed depositions despite St. Clair's motion for protective order.

March 18, 2004
- St. Clair writes to Canon advising that, pursuant to Delaware Local Rule 30.2, Canon is prohibited from proceeding with the depositions while St Clair's motion for a protective order is pending. St. Clair also offers that it will agree to stipulate to the authenticity of "any document produced from the files of a business that bears evidence on its face that the document was authored by an employee of the business."

10

March 18, 2004       • Canon sends e-mail to Mirage seeking further discussion concerning the proposed consulting arrangement, and speaks with Mirage by telephone conference later that day.

March 19, 2004       • Canon writes to St. Clair confirming that depositions will be adjourned until St. Clair's motion for a protective order has been decided, and advising St. Clair that it "reserves the right to take each of these depositions [with express reference to Mirage] as soon as the pending motion is resolved."

Late March, 2004       • Canon's counsel continues to negotiate with Mirage over possible terms of an agreement.

March 30, 2004       • Canon serves supplemental responses to St. Clair's discovery. The supplemental responses do not disclose or produce any of the communications that have occurred between Canon and Mirage.

March 30, 2004       • Discovery closes under the Court's Scheduling Order.

April 9, 2004       • Canon contacts St. Clair to schedule the depositions of Mirage and Kodak. Canon contends that St. Clair "ultimately refused to proceed with these depositions."

April 15, 2004       • Canon's counsel advises Mr. Hideki Sanatake (Canon, Inc.) by e-mail of a telephone conversation that day with principals of Mirage, confirms Mirage's interest in helping Canon, and provides a draft

agreement incorporating the terms discussed with Mirage. Canon's counsel writes that "One fear we have is that St. Clair may pay them for any rights they have to circumvent this possible defense."

April 20, 2004
- Mr. Sanatake (Canon, Inc.) advises Canon's counsel that he has conferred with Mr. Seymour Liebman (Canon USA). Both agree in principle to the agreement, and they provide numerous comments with respect to the proposed terms and draft language.

April 21, 2004
- E-mail from Hideki Sanatake (Canon, Inc.) to Canon's counsel providing additional comments to a revised draft of the proposed agreement.

April 22, 2004
- Canon's counsel transmits to Mirage a form of "Consulting Agreement and Covenant Not To Sue" approved by Canon earlier that day.

April 23-29, 2004
- Negotiations between Canon and Mirage continue with respect to the terms of the proposed agreement.

April 30, 2004
- The final version of the proposed agreement is transmitted from Canon's counsel to Mirage. Mirage executes the Consulting Agreement and forwards executed copies to Canon's counsel by facsimile and express mail.

May 4, 2004 to
May 7, 2004
- Canon's counsel meets with employees of Mirage to review documents and prepare declarations that will support Canon's ownership defense.

12

May 5, 2004
- Canon files Motion to Proceed with the Taking of Two Outstanding Depositions, including one of Mirage.

July 22, 2004
- Canon files Ownership Defense Motion, supported by declarations of Mirage employees.

July 26, 2004
- Canon sends e-mail to the Court urging prompt decision on Canon's Ownership Defense Motion, stating "This motion is extremely important because, if granted, it would end this litigation without the need for any further action by the Court . . . The defendants respectfully submit that this Court should take appropriate actions to promptly hear and decide the motion to dismiss."

July 27, 2004
- St. Clair notifies Court that it is withdrawing its objection to Canon's Motion to Proceed with the Taking of Two Outstanding Depositions, including the deposition of Mirage.

July 28, 2004
- St. Clair writes to Canon stating that, because the Ownership Defense Motion "relies entirely on claims made by Mirage," St. Clair has withdrawn its opposition to Canon's motion to proceed with a Mirage deposition and that St. Clair wishes to schedule Mirage depositions.

July 28, 2004
- Canon sends letter to the Court urging that "St. Clair, having all the while frustrated discovery of Mirage, should not be allowed to use Mirage discovery as a way to delay consideration of Canon's jurisdictional [Ownership Defense] motion," and urging that with the

13

Court's consideration of the Ownership Defense Motion "this case can end now."

July 28, 2004      • St. Clair writes to the Court noting that St. Clair's responsive brief to Canon's Ownership Defense Motion is not due until August 5, 2004.

July 29, 2004      • Canon sends letter to the Court urging that the Ownership Defense Motion is "one going to the basic jurisdiction of this Court. As a jurisdictional motion, it warrants priority treatment because if jurisdiction is lacking, the case should end." Canon's counsel again requests that the Court schedule a conference call to determine the scheduling and "logistical issues" attendant to the Ownership Defense Motion.

July 30, 2004      • Canon sends letter to St. Clair declining to schedule Mirage Depositions because "the questions of how and when to address Mirage-related issues are currently before the Court awaiting resolution."

August 2, 2004      • St. Clair sends letter to the Court requesting permission for St. Clair to depose (i) Mirage pursuant to Fed. R. Civ. P. 30(b)(6); and (ii) George Moussally and Kenneth Ford, employees of Mirage, who submitted declarations in support of the Ownership Defense Motion.

August 3, 2004      • Canon sends letter to the Court opposing St. Clair's August 2, 2004 request to depose Mirage, and again urging that the Court hold a

14

telephone conference "to determine how to proceed with scheduling and logistical issues attendant with [the Ownership Defense Motion]."

August 4, 2004 • Mirage sends e-mail to Canon's counsel advising that it has mailed its August invoice, and asking when Canon will pay Mirage's outstanding invoice for July. Mirage states "We would need to have both of these invoices paid before the deposition . . . ."

August 12, 2004 • Canon files its Reply Brief in support of the Ownership Defense Motion, supported by additional affidavits of Mirage employees and a declaration by former employee F. Jud Heinzmann.

August 13, 2004 • St. Clair requests by letter that Canon update its responses to specific interrogatories and requests for production.

August 17, 2004 • Canon responds to St. Clair's request for updated discovery, stating "we are in compliance with discovery requests . . . "

August 17, 2004 • Canon sends letter to the Court requesting oral argument on the Ownership Defense Motion.

August 19, 2004 • St. Clair issues subpoenas for depositions of Mirage pursuant to Rule 30(b)(6), and of those Mirage employees who submitted declarations in support of the Ownership Defense Motion.

August 30, 2004 • Canon moves for protective order to prohibit St. Clair from pursuing

15

"belated" discovery of Mirage.

September 7, 2004 • St. Clair files formal withdrawals of its (i) December 23, 2003 motion for protective order (for relief from the timing of subpoenas and deposition notices issued by Canon); and (ii) March 12, 2004 motion for protective order (seeking relief from eight depositions noticed by Canon for March 29-30, 2004).

September 16, 2004 • Pretrial Conference before Hon. Joseph J. Farnan, Jr. at which parties are directed there should be "no surprises to either side about what might be coming into the record."

September 16, 2004 • The Court issues order denying Ownership Defense Motion, but allows that ownership issues raised therein may be tried on the merits following Canon infringement trial. The Court – unaware of the existence of the Consulting Agreement and the amounts paid by Canon to St. Clair thereunder – also denies, as "moot," all outstanding motions with respect to discovery of Mirage.

September 20, 2004 • E-mail sent from Canon counsel (M. Baghdassarian) to other members of Canon's trial team asking "Do we need to turn [the Consulting Agreement] over at this point? As I write the direct, we are going to have to mention it. So do we have to designate it as a trial exhibit or turn it over? Any thoughts?" Baghdassarian, by deposition testimony dated May 10, 2005, testified he received no response to his e-mail

16

from anyone on the Canon trial team.

September 23, 2004    • St. Clair again requests by letter that Canon supplement its responses
                        to St. Clair's discovery requests, stating "Please immediately produce
                        all communication in any form with Mirage . . . including but not
                        limited to any letters, e-mail, draft declarations, agreements,
                        payments, or reimbursements."

September 23, 2004    • Canon responds to St. Clair's latest request for supplementation of
                        Canon's discovery responses by stating "Our understanding is that the
                        Court's [September 16, 2004] ruling on various discovery motions [as
                        moot], including denying St. Clair's request to proceed with discovery
                        of Mirage[,] resolves the matter."

September 27, 2004    • Infringement trial against Canon begins.

September 30, 2004    • Canon provides copy of Consulting Agreement to St. Clair's counsel
                        during recess in Canon infringement trial, after St. Clair has
                        completed its case in chief. Court questions Canon's counsel about
                        the timing of its production of the Consulting Agreement, and orders
                        discovery before the Special Master.

## Relief Sought

Following the completion of discovery before the Special Master, St. Clair renewed its
request for sanctions against St. Clair in submissions to the Special Master. St. Clair specifically
seeks, pursuant to Fed. R. Civ. P. 26 and 37, (a) the dismissal of Canon's ownership defense; (b)
reimbursement of St. Clair's attorney fees and costs incurred as a result of Canon's failure to

17

timely disclose the existence of the Consulting Agreement; and (c) such other and further relief

as is just. St. Clair expressly requests reimbursement of its attorney fees and costs related to:

(1)     St. Clair's Motion for Protective Order filed March 12, 2004 (D.I. 455);

(2)     Canon's Motion to Proceed with Taking Two Outstanding Depositions filed May 5, 2004 (D.I. 533);

(3)     St. Clair's Memorandum of Law in Opposition to Canon's Motion to Dismiss for Lack of Standing and Subject Matter Jurisdiction filed August 5, 2004 (D.I. 631);

(4)     St. Clair's Subpoenas served on Mirage in August 2004;

(5)     St. Clair's responses to Canon's letters filed with the Court requesting to block Mirage discovery between August and September 2004;

(6)     St. Clair's Motion for Leave to File a Conditional Rule 56(f) Affidavit in Support of St. Clair's Memorandum of Law in Opposition to Canon's Motion to Dismiss for Lack of Standing and Subject Matter Jurisdiction and St. Clair's Reply filed August 16, 2004 (D.I. 678);

(7)     St. Clair's Opposition to Canon's Motion for Protective Order to Prohibit St. Clair from Pursuing Belated Discovery in Violation of the Court's Rule 16 Scheduling Order filed August 30 (D.I. 740);

(8)     St. Clair's Motion in Limine to Preclude Canon from Offering Testimony from any of the Mirage Hearsay Witnesses at Trial filed September 20, 2004 (D.I. 821); and

(9)     all proceedings and submissions in front of [the] Special Master.

St. Clair's Renewed Submission to the Special Master in Support of a Finding that Canon Should

Have Disclosed the Mirage Consulting Agreement and Related Payments and Documents Before

September 30, 2004 and for Sanctions Against Canon, dated June 10, 2005 ("St. Clair's June 10,

2005 Renewed Submission") at p. 39-40.

## DISCUSSION

### Legal Standard

St. Clair seeks the dismissal of Canon's ownership defense, pursuant to Fed. R. Civ. P. 26

and 37, as sanction for Canon's alleged discovery violations. Dismissal of a claim or defense for

an alleged discovery abuse is an "extreme" sanction. *National Hockey League v. Metropolitan*

*Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2278, 2781 (1976); *accord, Poulis v. State Farm*

*Fire and Casualty Co.*, 747 F. 2d. 863, 867-68 (3d. Cir. 1984).

In *Societe Internationale,* the Supreme Court reversed the dismissal of an action as a

sanction under Fed. R. Civ. P. 37, holding that Rule 37:

> should not be construed to authorize dismissal of [a] complaint
> because of petitioner's noncompliance with a pretrial production
> order when it has been established that failure to comply has been
> due to inability, **and not to willfulness, bad faith, or any fault of**
> **petitioner**.

*Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357

U.S. 197, 212, 78 S. Ct. 1087, 1096 (1958) (emphasis added). The Supreme Court concluded

that the sanction of dismissal was inappropriate where a *Societe Internationale* party's

noncompliance was due to inability, since the party could not produce documents that were

confidential under foreign law. *Id.*

The Supreme Court's subsequent decision regarding the appropriateness of dismissal as a

sanction, in *National Hockey League,* further clarified that a party's deliberate bad behavior is

required as a predicate to the imposition of this ultimate sanction. In *National Hockey League,*

the Supreme Court considered the following district court record:

> After seventeen months were crucial interrogatories remained
> substantially unanswered despite numerous extensions granted at
> the eleventh hour and, in many instances, beyond the eleventh
> hour, and notwithstanding several admonitions by the Court and
> promises and commitments by the plaintiffs, **the Court must and**

19

062038.00610/40156788v.1

> **does conclude that the conduct of the plaintiffs demonstrates
> the callous disregard of responsibilities counsel owed to the
> Court and to their opponents. The practices of the plaintiffs
> exemplify flagrant bad faith** when after being expressly directed
> to perform an act by a date certain, . . . they failed to perform and
> compounded that noncompliance by waiting until five days
> afterwards before they filed any motions. Moreover, this action
> was taken in the face of warnings that their failure to provide
> certain information could result in the imposition of sanctions
> under Fed. R. Civ. P. 37. If the sanction of dismissal is not
> warranted by the circumstances of this case, then the Court can
> envision no set of facts whereby that sanction should ever be
> applied.

*National Hockey League*, 427 U.S. at 640-641 (citations omitted). The Supreme Court held that

the district court did not abuse its discretion by dismissing the underlying action for plaintiffs'

failure to comply with discovery orders, concluding that "the extreme sanction of dismissal was

appropriate in this case by reason of [plaintiffs'] 'flagrant bad faith' and their counsel's 'callous

disregard' of their responsibilities." 427 U.S. at 643.

St. Clair must therefore demonstrate that Canon acted in deliberate bad faith and/or in

callous disregard of its discovery responsibilities before St. Clair can obtain dismissal of Canon's

ownership defense as sanction. *Donnelly v. Johns-Manville Sales Corp.*, 677 F. 2d 339, 342 (3d

Cir. 1982) ("dismissal is a drastic sanction and should be reserved for those cases where there is

a clear record of delay or contumacious conduct by the [party]"). Providing specific guidance

for this analysis is the Third Circuit's decision in *Poulis*, which delineates the factors that a trial

court should balance in assessing whether dismissal is an appropriate sanction:

> (1) the extent of the *party'*s personal *responsibility*; (2) the
> *prejudice* to the adversary caused by the failure to meet scheduling
> orders and respond to discovery; (3) a *history* of dilatoriness; (4)
> whether the conduct of the party or the attorney was *willful* or in
> *bad faith*; (5) the effectiveness of sanctions other than dismissal,
> which entails an analysis of *alternative sanctions;* and (6) the
> *meritoriousness* of the claim or defense.

*Poulis,* 747 F. 2d at 868 (emphasis in original). As noted by this Court, "Third Circuit precedent requires courts to evaluate [these] six factors when determining whether a complaint should be dismissed with prejudice . . . ." *Wilson v. Pinkerton, Inc.*, No. Civ. A. 99-896 JJF, *op.* at *2 (D. Del. Mar. 23, 2004) (Farnan, J.) [available as 2004 WL 609327].

Accordingly, the Special Master analyzes Canon's conduct against the *Poulis* factors, which are addressed herein in slightly different order.

## A.    Conclusions Regarding Canon's *Personal Responsibility*

The first *Poulis* factor – the extent of Canon's "personal responsibility" – examines whether Canon should be personally responsible for the actions, or inactions, of its counsel.[9]  In examining this factor, the Special Master considers background facts developed by St. Clair.

During discovery before the Special Master, St. Clair deposed Seymour E. Liebman, the Executive Vice-President and General Counsel of Canon U.S.A., who executed the Consulting Agreement on behalf of Canon. Mr. Liebman has been a licensed attorney for approximately 15 years, and is admitted to practice in multiple jurisdictions. May 11, 2005 Deposition of Seymour E. Liebman ("Liebman Dep.") at 4:17-25 to 5:1-11. Mr. Liebman describes himself as the primary contact on behalf of Canon U.S.A. and, together with Mr. Hideki Sanatake from Canon, Inc., served as an interface with Canon's counsel in this litigation. Liebman Dep. at 5:12-25 to 6:1-6. ("Basically Kramer Levin would speak to either Mr. Sanatake or me or both of us, and then we – we would get approval, depending on – on the request."). Mr. Liebman also reviewed information received from both Canon, Inc. and Canon's counsel regarding this litigation. Liebman Dep. at 5:15-17.

---

[9] It should be noted that, in applying this factor, even a finding that a party lacks responsibility for its counsel's dilatory conduct "is not dispositive, because a client cannot always avoid the consequences of the acts or omissions of its counsel." *Poulis*, 747 F.2d at 868 (citation omitted).

The Special Master is satisfied that the Canon defendants, as multi-million dollar companies, are sophisticated consumers of the type of legal services provided to them by their counsel in this patent litigation. Additionally, Canon had in Mr. Liebman at least one legally trained and experienced individual providing oversight and advising it with respect to the conduct of this litigation.

The Special Master therefore concludes that under these circumstances, and for the specific reasons that will be further discussed herein, it is appropriate that Canon share responsibility with its counsel with respect to (i) entering into the Consulting Agreement and offering consideration to fact witnesses; and (ii) fulfilling its discovery obligations under the Federal Rules of Civil Procedure.

## 1.    Propriety of Consulting Agreement/Consideration to Fact Witnesses

St. Clair urges that the Consulting Agreement is repugnant to the interests of justice:

> [T]he very nature of the Consulting Agreement prejudices St. Clair. The document itself it against public policy as it obligated Mirage to "cooperate and provide assistance to Canon . . . including . . . providing testimony in court and by deposition . . . . " [Consulting Agreement, Exh. 1] at ¶ 2.1.

> It is not proper to pay a fact witness for the purpose of obtaining their testimony in a case, or to create an incentive for a witness to testify in a particular manner. Del. State Bar Assoc. Comm. on Prof'l Ethics Formal Op. 2003-3 (citation omitted); *see also Golden Door Jewelry Creations, Inc. v. Lloyd's Underwriters Non-Marine Assoc.*, 865 F. supp. 1516, 1526 (S.D. Fla. 1994) ("Rule 3.4(b) of the Rules of Professional Conduct clearly prohibit[s] a lawyer from paying or offering to pay money or other rewards to witnesses in return for their testimony, be it truthful or not, because if violates the integrity of the justice system and undermines the proper administration of justice."); *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 656 (N.D. Ill. 1986) ("Payment to [induce] a witness to testify in a particular way . . . and the payment . . . to make him sympathetic . . . are all payments which are absolutely indefensible.") (citation omitted).

22

> Here, Canon has inpermissively agreed to pay Mirage an
> exorbitant $75,000 plus $300 per hour for testimony of any Mirage
> employee, for a total of over $165,000, regardless of the actual
> reasonable value of the lost time. The invoices submitted by
> Mirage suggest Mirage witnesses spent over 330 hours and
> charged Canon at least $92,693.97 for their "cooperation" and
> testimony. [Mirage Invoices] MRG 00305-509. That is far
> beyond reasonable and is highly prejudicial to St. Clair because St.
> Clair could never expect to get unbiased and fair testimony from
> Mirage after Mirage was coached by Kramer [Levin] attorneys and
> then entered into that Agreement.

St. Clair's June 10, 2005 Renewed Submission at pp. 31-32.

Although the Special Master was not informed by or able to locate authority by this Court

on point, the Special Master does find persuasive a recent analysis by another district court

within the Third Circuit. The United States District Court for the District of New Jersey recently

addressed a situation whereby an attorney offered to pay a fact witness $100 an hour for the

witness' time in reviewing documents over a two week period. Relying in part upon New Jersey

Rule of Professional Conduct 3.4 (b) – which is the same in relevant part as the ABA Model

Rule of Professional Conduct 3.4 (b) and the Delaware Lawyers' Rule of Professional Conduct

3.4 (b) – the New Jersey District Court reasoned:

> RPC 3.4 (b) provides, in pertinent part that "[a] lawyer shall
> not . . . offer an inducement to a witness that is prohibited by law."
> **Generally, lawyers may only compensate fact witnesses for: (1)
> reasonable expenses incurred by a witness in attending trial or
> testifying; or (2) reasonable compensation for the loss of a
> witness' time in attending trial or testifying**. This common law
> principle is codified in 18 U.S.C. § 201, the criminal statute
> prohibiting bribery of public officials and witnesses. Section 201
> specifically provides that it does not prohibit "the payment by the
> party upon whose behalf a witness is called and receipt by a
> witness, of the reasonable cost of travel and subsistence incurred
> and the reasonable value of time lost in attendance at any such
> trial, hearing or proceeding . . . . " 18 U.S.C. § 201 (d).
>
> Moreover, agreements to compensate fact witnesses for
> expenses or services other than those specified above lack
> consideration and are unenforceable as against public policy.

23

> **Courts have rejected such agreements as "lean[ing] toward a procurement of perjury; toward the raising of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit; toward the perversion of justice; and toward the perversion of our courts."**

*In the Matter of the Complaint of PMD Enterprises Inc.*, 215 F. Supp. 2d 519, 529-30 (D.N.J. 2002), *appeal dismissed*, 301 F.3d 147 (3d Cir. 2002) (citations omitted) (emphasis added).

The Special Master agrees that, even if it had been disclosed, the ethical propriety of the Consulting Agreement raises serious questions. The $75,000 paid to Mirage immediately following the execution of the Consulting Agreement is **not** expressly tied to a license or the covenant not to sue. Consulting Agreement, Exh. 1 at ¶ 6.1. Rather, it is recited as "consideration of the foregoing" which references paragraphs that include Mirage's agreement to "cooperate and provide assistance to Canon."[10] Consulting Agreement, Exh. 1 at ¶ 2.1. As such, this payment was clearly intended to constitute consideration for Mirage's assistance in an amount above and beyond Mirage's actual lost time and expenses. Moreover, the additional $92,693.97 paid by (or due from) Canon to Mirage for Mirage's lost time and expenses as of September 30, 2004, appears to clearly exceed the "reasonable compensation" that is permitted under ethical guidelines for compensating a witness for out-of-pocket expenses and time spent attending deposition or trial. *See, e.g.*, ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 96-402 (1996) (opining that lost time must "be reasonable, so as to avoid effecting, even unintentionally, the content of a witness's testimony.").

The Special Master does not hereby definitively opine on the ethical propriety of Canon entering into the Consulting Agreement with fact witness Mirage, other than to note that the

---

[10] It is clear that from the outset of negotiations between Canon and Mirage that the lump sum payment was intended, at least in part, to procure Mirage's assistance. *See, e.g.*, April 15, 2004 E-mail from Donald Rhoads to Hideki Sanatake ("They want Canon to pay them a $50,000 lump sum **for their help and their agreement not to sue Canon** if they obtain any rights in the patents.") (emphasis added).

062038.00610/40156788v.1

propriety is clearly questionable. The Special Master also notes that, notwithstanding the obviously questionable ethical propriety, Canon personally approved its counsel's suggestion to negotiate and enter into a consulting arrangement with Mirage, Baghdassarian Dep. 14:25-15:6, and an executive representative of Canon endorsed the resulting Consulting Agreement. Liebman Dep. at 8:9-15. Canon personally participated in drafting the terms and language of the Consulting Agreement, even raising the suggestion that invoicing and payment of Mirage's consulting fees be structured through invoices submitted to Canon's counsel, which the Special Master concludes decreased the likelihood that these documents would be discovered by St. Clair.

An even more troubling issue exists with respect to the Declaration of Fred J. (Jud) Heinzmann that was filed by Canon, under seal, on August 12, 2004. D.I. 658. Mr. Heinzmann was a co-founder and former officer of Mirage. He was no longer an employee of Mirage during the following events that occurred in August 2004.

On August 3, 2004, counsel for St. Clair contacted Mr. Heinzmann to seek information about what was discussed during a December 1992 lunch meeting between Mr. Heinzmann and Marc Roberts, an inventor of the patents-in-suit. Following his discussion with Mr. Heinzmann, St. Clair's counsel prepared a draft affidavit for Mr. Heinzmann's signature that allegedly memorialized the statements made by Mr. Heinzmann during that telephone interview. Declaration of Nicholas S. Boebel, Esquire, dated August 4, 2004 at ¶¶ 3-10. The draft declaration prepared by St. Clair's counsel attributes the following statement to Mr. Heinzmann:

> When Mr. Roberts disclosed his digital camera invention to me, I did not believe that there was any conflict with or overlap between his work on the invention and his work for Mirage. I also did not believe that the digital camera invention was even remotely related to the business or technological interests of Mirage. At the

25

> conclusion of our discussion, I wished him good luck with his
> digital camera work.

*Id.* at Exh. 1, ¶ 4. Mr. Heinzmann never signed the declaration prepared by St. Clair, and abruptly refused further contact with St. Clair's counsel.

On August 12, 2004, Canon filed its version of a declaration actually signed by Mr. Heinzmann. D.I. 658. In the Heinzmann Declaration submitted by Canon, Mr. Heinzmann's statement with respect to the lunch meeting with Mr. Roberts is inconsistent with what St. Clair's counsel swears Mr. Heinzmann told him:

> During this conversation, Mr. Roberts did not disclose to me that
> he had developed his digital camera idea during his employment at
> Mirage. In addition, I did not discuss with Mr. Roberts whether
> his idea would be of interest to Mirage or whether his idea related
> to the business of Mirage. The focus of my conversation with Mr.
> Roberts concerned whether I, individually, would be interested in
> providing technical support and assistance relating to Mr. Robert's
> digital camera idea. I later informed Mr. Roberts that I was not
> interested in providing technical support or assistance for his idea.

D.I. 658 at ¶ 5. In the Canon Declaration, Mr. Heinzmann purports to explain any possible discrepancy by stating that "to the extent that the statements I have outlined above are inconsistent with what the attorney who represents St. Clair claimed I may have stated during our conversation, this declaration will serve as an accurate account of events to the best of my knowledge." D.I. 658 at ¶ 9.

Of particular concern to the Special Master is a letter sent by Canon's counsel to Mr. Heinzmann during the nine-day interval between St. Clair's conversation with Mr. Heinzmann on August 3, 2004 and Canon's filing of the Heinzmann Declaration on August 12, 2004. The letter states:

> This letter will confirm our understanding to reimburse you for
> your expenses and legal representation in regard to the above-
> referenced [litigation].

26

> We understand your time is valuable and the time you spend with us could have been spent in other important endeavors. Therefore, **we agree to reimburse you for actual out-of-pocket expenses (e.g., travel, copying, mailing, or other office-related expenses) that you may incur in connection with your time devoted to this matter**. **We will also provide you, if necessary, with reasonable legal representation, without cost to you,** in connection with the facts and circumstances directly related to the above-referenced matter. Please acknowledge your understanding by signing on the line provided below.

August 10, 2004 Letter from Mark A. Baghdassarian to F. Jud Heinzmann, KL 000139, (emphasis added). The timing of this letter, combined with yet another offer of consideration to a fact witness (free legal representation) that is over and above permissible reimbursement, raises troublesome questions and further weighs against Canon in assessing personal responsibility.

Accordingly, the Special Master concludes that the negotiation and execution of the Consulting Agreement and Canon's offers of consideration to fact witnesses weigh against Canon and in favor of assessing Canon's personal responsibility, given the questionable ethical propriety of these activities and Canon's non-disclosure of them to St. Clair and the Court.

## 2.   Canon's Failure to Supplement or Otherwise Disclose

An additional factor considered by the Special Master in assessing Canon's personal responsibility is Canon's failure to comply with its discovery obligations under Fed. R. Civ. P. 16, 26, 33 and 34. Prior to the close of discovery, St. Clair propounded numerous Interrogatories and Requests for Production on Canon regarding the patents-in-suit. St. Clair urges – and the Special Master expressly concludes – that the negotiation, existence and production of the Consulting Agreement would have been responsive to at least the following discovery requests made by St. Clair:[11]

---

[11] St. Clair additionally identifies Interrogatory Nos. 13 and 17. The Special Master does not find that information of or about the Consulting Agreement was elicited by, or would have been clearly responsive to, those interrogatories.

27

- Interrogatory No. 4 – For each defense or counterclaim you assert, state the facts upon which you base your defense or counterclaim.

- Interrogatory No. 7 – Identify every patent license or agreement, which includes rights in or to a patent, that you have been a party to since 1992, including, without limitation, licenses or agreements relating to your consumer products, and for each such license or agreement state: (a) the parties to the license or agreement; (b) the subject matter of the license or agreement; (c) the royalty rate; (d) all consideration given or received; (e) all patents in the license or agreement (whether directly or by cross license); and (f) the date of the agreement.

- Interrogatory No. 18 – Identify and describe in detail all contacts or communications you have had with any of the other named defendants or any third party, including legal counsel, regarding the subject matter of this lawsuit, including, without limitation, the *St. Clair Intellectual Property Consultants, Inc. v. Sony, et al.* case, Civil Action No. 01-557 or the St. Clair patents, including the other defendant or third party contacted, the dates, locations, mode of such contact or communication (e.g. telephonic, in person, facsimile, e-mail, letter etc.).

- Interrogatory No. 19 – Identify all persons, including legal counsel and any third parties, involved in your review of the patents-in-suit or your evaluation, discussions, or consideration concerning the licensing of any of the patents-in-suit.

- Document Request No. 1 – All documents identified, relied upon, reviewed, or consulted in responding to Plaintiff's First Set of Interrogatories to Defendants.

28

- Document Request No. 22 – Complete copies of all licenses or agreements to which you are a party, including without limitation, cross licenses, inter-company agreements, settlement agreements, covenants no to enforce or releases, relating to consumer products, including without limitation, the digital cameras, digital camera technology or parts used therein, identified in response Plaintiff's First Set of Interrogatories, Interrogatory No. 1.

- Document Request No. 28 – All documents that refer or relate to St. Clair or the patent-in-suit, including but not limited to, documents that refer or relate to your first knowledge of the patents-in-suit.

- Document Request No. 29 – All documents that refer or relate to your evaluation or consideration of the patents-in-suit.

- Document Request No. 37 – All documents, which reflect, refer or relate to or concern the patents-in-suit, St. Clair, Aura, PCC, Epix, Sierra Digital, and/or the inventors.

- Document Request No. 42 – All documents that refer, summarize or relate in any way to any meetings or discussions regarding infringement, validity or enforceability of the patents-in-suit.

- Document Request No. 59 – All documents which you may introduce at the trial of this matter.

The record clearly establishes that Canon failed to supplement its responses to these discovery requests as required by Fed. R. Civ. P. 26(e). In this regard, Canon contacted and began discussions with Mirage as early as December 2003, well before the close of discovery on

29

March 30, 2004. MRG 00401; KLP 000001-3; April 27, 2005 Deposition Transcript of Kenneth Ford ("Ford Dep.") at 113:21-114:8 and 84:21-85:9; and May 10, 2005 Deposition Transcript of Mark A. Baghdassarian ("Baghdassarian Dep.") at 84:10-86:16 and 89:3-15. Although Canon admits that its discussions with Mirage were not privileged, Baghdassarian Dep. at 132:6-10, at no time between December 2003 and September 30, 2004 did Canon supplement its discovery responses to disclose its communications with Mirage or to produce documents containing those communications, as expressly sought by at least Interrogatory Nos. 18 and 19 and by Document Request Nos. 1, 28, 29, 37 and 42.

Additionally, at no time between the execution of the Consulting Agreement on April 30, 2004 and September 30, 2004 did Canon supplement its discovery responses to either disclose the existence of the Consulting Agreement and related documents, or to produce them, as required by at least Interrogatory Nos. 7, 18 and 19 and Document Request Nos. 1, 22, 28, 29, 37, 42 and 59.

The Special Master concludes that Canon has some personal responsibility for these failures for two reasons. First, non-disclosure served Canon's business interests, at least initially, by reducing the possibility that St. Clair would compete with Canon's efforts to purchase Mirage's rights in the patents-in-suit. In fact, during negotiations for the Consulting Agreement, Canon instructed its counsel as follows:

> [W]e believe an **ideal transaction would be a full assignment of patents or any rights Mirage may have under the contract to Canon, rather than mere covenant not [to] sue**, since this would be a big bargaining chip for negotiation with St. Clair in case of settlement discussion in which St. Clair may insist on the most favored nation clause.

30

April 20, 2004 E-mail from Hideki Sanataki (Canon, Inc.) to Mark Baghdassarian, Donald Rhoads, Vito DeBari and John Daniel, with copy to Seymour Liebman, at KLP 000013-14 (emphasis added).

Second, the litigation was conducted under the auspices of an in-house attorney for Canon, one who should have recognized that Canon was abrogating its duties under the Federal Rules of Civil Procedure by not disclosing the arrangement with Mirage. Non-disclosure also served Canon's litigation strategy because, in the words of Canon's counsel "One fear we have is that St. Clair may pay them for any rights [Mirage has] to circumvent this possible defense." KLP 000004. The Special Master therefore concludes that Canon's failure to supplement its discovery responses, as required under Fed. R. Civ. P. 26(e), is an additional consideration that weighs against Canon and in favor of assessing personal responsibility.

In sum, based upon Canon's personal responsibility with respect to the propriety of the Consulting Agreement, its offers of consideration to fact witnesses, and Canon's failure to comply with its discovery obligations, the Special Master concludes that the "personal responsibility" factor weighs against Canon.

## B.   Special Master's Conclusions Regarding Canon's *History* of Dilatoriness

The Special Master concludes that the second *Poulis* factor – that of Canon's "history of dilatoriness" – is best analyzed in the context of events in the litigation that should have prompted Canon to supplement its discovery responses to disclose and produce the Consulting Agreement and related communications.    The record clearly reveals numerous missed opportunities. The Special Master briefly recounts several of these events and concludes, as to each, that Canon consciously determined not to supplement its discovery responses with respect to each event. Taken together, they evidence a pattern of Canon's failure to disclose and produce the Consulting Agreement and related documents.

31

### 1. Canon's March 30, 2004 Supplementation of Discovery

At the close of discovery on March 30, 2004, Canon supplemented its discovery responses. Canon's supplementation notably did not disclose its communications with Mirage which began in December 2003, nor did the supplementation produce copies of communications between Canon and Mirage – which were ongoing between December 2003 and March 30, 2004 – although Canon's counsel admits its communications with Mirage were not privileged. Baghdassarian Dep. At 132:6-10.[12]

### 2. April 30, 2004 Execution of the Consulting Agreement

The most obvious opportunity for Canon to disclose and produce the Consulting Agreement was immediately following its execution on April 30, 2004. During the negotiations that led to the Consulting Agreement, Canon's counsel had expressed concern that St. Clair could throw a monkey wrench into the negotiations if it approached Mirage with an offer to purchase Mirage's right (if any) in the patents-in-suit. KLP 000004 ("One fear we have is that St. Clair may pay them for any rights they have to circumvent this possible defense."). But St. Clair did no such thing. Rather, the Consulting Agreement was negotiated and executed before St. Clair learned of Canon's ownership argument.

Moreover, the Consulting Agreement expressly provides that the covenant not to sue contained therein is binding not upon only Mirage, but also upon "its assignees, licensees, transferees, or other designees". Consulting Agreement, Exh. 1 at ¶. 3.1. Canon therefore had a covenant not to sue even if another party later bought whatever "rights" Mirage has in the patents-in-suit. Accordingly, the Special Master concludes that following execution of the Consulting Agreement by Mirage on April 30, 2004, Canon had no legitimate reason for failing

---

[12] Mark Baghdassarian, Esquire, was the designee for the Rule 30(b)(6) deposition of the law firm of Kramer Levin, lead counsel to Canon.

32

to immediately disclose and produce the Consulting Agreement in response to those discovery requests that expressly sought disclosure and production of Canon's licenses and agreements.

## 3. Canon's Motion to Proceed With the Taking of Two Depositions

On May 5, 2004, just five days after Canon executed the Consulting Agreement, Canon filed a Motion to Proceed With the Taking of Two Outstanding Depositions of Mirage and Kodak ("Canon's Motion to Compel"). D.I. 533. On the very day that Canon filed its Motion to Compel, Canon's counsel was physically present at Mirage headquarters, working with Mirage employees to review documents and prepare the witness declarations that would later support the Ownership Defense Motion.

Canon did not disclose to St. Clair or the Court the existence of the Consulting Agreement at the time it filed its Motion to Compel, although the terms of the Consulting Agreement specifically and already obligated Mirage to "cooperate and provide assistance to Canon . . . including . . . providing testimony in Court and by deposition . . . . " Consulting Agreement, Exh. 1 at ¶ 2.1. Because the Consulting Agreement created a duty by which Mirage was contractually obligated to cooperate with Canon, the Special Master concludes that Canon was required to disclose and produce the Consulting Agreement to St. Clair and the Court in connection with its petition to the Court for what the Special Master concludes to be the unnecessary relief sought by this motion.[13]

## 4. The Ownership Defense Motion

On July 22, 2004, Canon filed its case dispositive Ownership Defense Motion challenging for the first time Mirage's alleged ownership of the patents-in-suit. Much of the

---

[13] This motion is further discussed in conjunction with the Special Master's examination of the "willfulness and/or bad faith" factor, *infra* at pp. 46, 55-56.

33

factual support for this Motion was provided by lengthy declarations of two Mirage employees,

filed contemporaneously with the Motion. D.I. 612-616.

In that Motion, Canon urged the Court to dismiss St. Clair's lawsuit on the basis of the

ownership defense, providing the following historical overview and explanation of its

relationship with Mirage:

> Mirage was informed of the existence of the Patents for the
> first time when Canon's counsel served Mirage with a subpoena in
> this action. As Mirage produced documents pursuant to the
> subpoena and discussions regarding the scheduling of depositions
> continued over the next several months, it became apparent that
> Mirage, not St. Clair, was the true owner of the Patents. As
> explained in his declaration, when Dr. Moussally recently
> reviewed the Patents, he came to the same conclusion. (Moussally,
> Decl. ¶¶ 64, 79, 88-89). Dr. Moussally stated that "I believe that
> based on the Invention disclosed in the Roberts Patents and the
> Employment Agreement executed by Mr. Steasl, Mr. Roberts and
> Mr. Chikosky . . . Mirage is the owner of the Roberts Patents."
> (Moussally, Decl. ¶ 79).
>
> When Canon attempted to schedule the depositions of
> Mirage in early March, St. Clair filed a motion to postpone several
> depositions, including the depositions of Mirage. St. Clair then
> agreed to proceed with certain depositions that were the subject of
> its motion, but refused to proceed with the Mirage depositions.
> (D.I. 455). Canon then filed a motion currently pending before this
> Court to compel St. Clair to proceed with these depositions. (D.I.
> 533). Since then, Canon has obtained declarations from two of
> Mirage's co-founders who currently work at Mirage. These are
> being submitted herewith.

D.I. 613 at p. 26.

Notwithstanding the detail Canon provided to the Court concerning Mirage, Canon still

did not disclose to either the Court or St. Clair the existence of the Consulting Agreement or the

payments of fees it had already made to Mirage thereunder.

34

## 5. The St. Clair Letter of August 13, 2004

While the Ownership Defense Motion was pending, St. Clair requested the disclosure and production of any agreements that Canon and/or Fuji had with Mirage. In an August 13, 2004 letter from St. Clair's counsel directed jointly to Canon's and Fuji's counsel, St. Clair specifically requested any agreements between either Canon or Fuji and Mirage or any person who submitted an affidavit in support of the Ownership Defense Motion. Canon's counsel admits that it considered this letter to be a "line-item" request by St. Clair for Canon to supplement its discovery responses. Baghdassarian Dep. at 34:22-24.[14]

Specifically, St. Clair asked for disclosure of "any retainer, reimbursement, payment, license agreement, purchase agreement, assignment or other financial or business relationship." August 13, 2004 Letter from Becky Thorson, Esquire to John Daniel, Esquire and Vito DeBari, Esquire (Canon's counsel) and Steven Routh, Esquire and Sten Jensen, Esquire (Fuji's counsel) ("This information is discoverable (and should have been produced months ago) pursuant to at least St. Clair's Interrogatory Nos. 4, 7, 13, 17, 18, and 19, and St. Clair's Requests for Document Request Nos. 1, 22, 28, 29, 37, 42 [and] 59. Please provide all responsive information and produce these documents by end of business August 17, 2004.").

Canon's counsel responded as follows:

> We write regarding your letter of August 13, 2004 regarding St. Clair's request for documents relating to Mirage or to any person who has submitted an affidavit in connection with Canon's pending motion regarding ownership of the patents-in-suit. As an initial matter, we have considered your letter and believe **we have complied with our discovery obligations relating to your letter**. In addition, we note that the deadline for seeking third party discovery has long passed and you do not explain any reason for disregarding that deadline, especially in light of St. Clair's unilateral cancellation of the Mirage deposition that was previously

---

[14] As discussed in greater detail *infra* at p. 40, Canon has argued that it was only required to supplement its discovery responses if St. Clair requested "line-item" supplementation.

> scheduled. Further, as you may recall, the questions of how and
> when to address Mirage-related issues are currently before the
> Court awaiting resolution. (Emphasis added).

August 17, 2004 Letter from Donald L. Rhoads, Esquire to Becky Thorson, Esquire.

Despite its affirmative representation that it was in compliance with its discovery

obligations, Canon yet again did not disclose the existence of the Consulting Agreement or the

fees it had already paid to Mirage thereunder. Canon's reference to "Mirage-related issues . . .

currently before the Court awaiting resolution" appears to reference pending discovery motions

relating to depositions of Mirage. These include St. Clair's March 12, 2004 motion for a

protective order that had sought relief from – in the form of rescheduling from March 29-30 until

April 13-30, 2004 – certain of the deposition subpoenas issued by Canon due to a scheduling

conflict, D.I. 455, as well as Canon's own May 5, 2004 Motion to Compel (the taking of two

Mirage depositions), D.I. 533, discussed *supra* at p. 33.

Importantly, the Special Master is mindful that the "Mirage-related issues" referenced by

Canon did not include any motion by Canon for a protective order or other relief sufficient to

excuse Canon from its duty to timely supplement the interrogatories and requests for production

previously propounded by St. Clair, as expressly requested by St. Clair's August 13 letter.

## 6.    **The September 16, 2004 Pretrial Conference**

On September 16, 2004, the Court held a pretrial conference for the Canon infringement

trial that would commence on September 27, 2004. At the pretrial conference, the Court took

issue with a statement contained in the proposed pretrial order to the effect that both parties

"have not listed those exhibits that may be used for purposes of cross-examination,

impeachment, or rebuttal." D.I. 818 at 6:15-19. Rejecting the "exception" language proposed by

the parties, the Court clarified its expectation that there be no surprises at trial:

36

> If an exhibit isn't listed in the pretrial order, it has no use at trial. I
> don't need you to categorize your intention as to use, but you've got
> to list all exhibits that would be used at the trial.
>
> **The whole idea of a civil pretrial is so that there are no
> surprises to either side about what might be coming into the
> record.**

D.I. 818 at 6:20-24 to 7:1-4 (emphasis added).

At this pretrial hearing, the Court also announced it was denying Canon's request to

dismiss St. Clair's claims based on the Ownership Defense Motion, allowing that the issues

raised by Canon's ownership defense could be presented at trial. D.I. 818 at 26:7-12; D.I. 812.

Based on its denial of the Ownership Defense Motion, the Court also – without any knowledge

of the existence of the Consulting Agreement – denied as "moot" the multiple motions filed by

the parties that sought to compel, or sought protection from, depositions of Mirage. D.I. 782,

795, 804.

## 7.     September 20, 2004 Canon Trial Team E-mail

Following the pretrial conference, a member of Canon's trial team sent the following

e-mail message to other members of its trial team:

> **Do we need to turn [the Consulting Agreement] over at this
> point?** As I write the direct, we are going to have to mention it.
> So do we have to designate it as a trial exhibit or turn it over? Any
> thoughts?

September 20, 2004 E-mail from Mark Baghdassarian to John Daniel, Donald Rhoads, Vito

DeBari and Keith Walter (emphasis added). The Special Master found it curious to learn that

Baghdassarian received no response to his e-mail from anyone on the Canon trial team.

Baghdassarian Dep. at 102:22-25 and 103:1-25. The Special Master concludes that Canon yet

again determined that it would not provide St. Clair or the Court with a copy of the Consulting

Agreement, even though the start of trial was only one week away.

37

## 8.  The St. Clair Letter of September 23, 2004

On September 23, 2004, a few days prior to trial, St. Clair's counsel sent the following

letter to Canon's counsel:

> In response to your letter of August 17, 2004, **we are concerned whether Canon has complied with its discovery obligations. Canon has an ongoing duty to supplement its responses to St. Clair's discovery requests under Fed. R. Civ. P. 26 (e) as requested in our August 13, 2004 letter** (copy attached). Please immediately produce all communication in any form with Mirage or with any of Mr. Moussally, Mr. Fialer, Mr. Ford, Mr. Heinzmann, and Mr. Weiner, including but not limited to any letters, e-mail, draft declarations, agreements, payments, or reimbursements.  If you refuse to produce any information responsive to our requests or this letter, please identify the information and explain the basis for your refusal. If you contend no responsive information exists, please give us your express representation that no responsive information exists. (Emphasis added).

September 23, 2004 Letter from Jake M. Holdreith, Esquire to Donald L. Rhoads, Esquire.

Canon's counsel – although aware that the Court had ruled on the discovery motions regarding

Mirage without any knowledge of the existence of the Consulting Agreement and payments

made to Mirage thereunder – nonetheless responded to St. Clair's request by letter dated

September 23, 2004, as follows:

> **Our understanding is that the Court's ruling on various discovery motions, including denying St. Clair's request to proceed with discovery of Mirage resolves the matter**. I would further note that if St. Clair disagreed with Canon's position as articulated in my August 17 letter, it could have raised the issue by motion at that time, rather than now, almost five weeks later, on the eve of trial. I would still further note, following your logic, that there are numerous categories of discovery as to which St. Clair has not updated production – e.g., communications between St. Clair and PCC and the inventors, and recent prosecution history.

38

September 23, 2004 Letter from Donald L. Rhoads, Esquire to Jake M. Holdreith, Esquire (emphasis added). Once again Canon did not disclose or produce the Consulting Agreement and related documents, nor did Canon disclose the fees already paid to Mirage thereunder.

In sum, the Special Master considers the pattern of Canon's repeated failure to supplement its discovery responses to produce the Consulting Agreement and related documents and to disclose the payments made to Mirage in the face of numerous events – events that would be expected to prompt disclosure and production – and concludes that the "history of dilatoriness" factor weighs against Canon.

## C.  Special Master's Conclusions Regarding *Willfulness* and *Bad Faith*

The next *Poulis* factor to be considered is whether Canon and/or its counsel acted "willfully" or in "bad faith." For this determination, the Special Master has considered the reasons offered by Canon to excuse its conduct, evidence of fraud on the Court, and evidence of Canon's lack of candor toward St. Clair and the Court.

## 1.  Conclusion:  Canon Offers No Support to Excuse Its Conduct

It is uncontroverted that during the five months between the execution of the Consulting Agreement on April 30, 2004 and the commencement of the infringement trial against Canon on September 27, 2004, Canon did not disclose the existence of the Consulting Agreement and related documents to St. Clair or the Court. Further, Canon did not produce the Consulting Agreement and related documents to St. Clair or to the Court. Finally, Canon did not voluntarily disclose to St. Clair or the Court that it had thus far paid a lump sum of $75,000 to Mirage, and that it had additionally paid to Mirage, or Mirage was owed, $92,693.97 in "lost time" consulting fees under the Consulting Agreement.

The record is also clear that as a direct result of Canon's failure to timely supplement its discovery responses to disclose and produce both the Consulting Agreement and the payments

39

made to Mirage thereunder, the Court was required to recess trial on the ownership defense and order discovery before the Special Master. If the ownership defense is permitted to go forward, it must do so at a separate trial yet to be scheduled.

Canon does not argue that its failures were inadvertent or the result of oversight. Rather, Canon proffers reasons to excuse its failure to supplement its discovery responses – as clearly required under Fed. R. Civ. P. 26(e) – that offer variations on three basic themes.

First, Canon argues that the parties had agreed that they would supplement their discovery responses only in response to "line-item" requests for supplementation by the opposing party. Even if true, Canon admits that it considered St. Clair's letter of August 13, 2004 to be a "line-item" request for supplementation. Baghdassarian Dep. at 34:22-24. Yet, with only six weeks remaining before the start of trial, Canon did not supplement its discovery responses even in light of St. Clair's demand. Perhaps that is because, as argued by St. Clair, no such agreement existed between the parties on "line-item" supplementation. Moreover, even if such an agreement existed, the Special Master concludes that Canon was not free to disregard the Federal Rules of Civil Procedure except by an appropriate order of the Court. The record is clear that no such relief was sought from, or entered by, the Court.

Second, Canon argues that its failure to comply with its obligation to supplement its discovery responses was actually the fault of St. Clair because (a) St. Clair "blocked" Canon's attempts to depose Mirage, forcing Canon to approach Mirage directly; and (b) St. Clair failed to move to compel Canon to supplement its responses. *See, e.g.*, September 23, 2004 letter from Canon's counsel to St. Clair's counsel ("I would further note that if St. Clair disagreed with Canon's position as articulated in [Canon's] August 17 letter – [that Canon has "complied with

our discovery obligations"] – it could have raised the issue by motion at that time, rather than now, almost five weeks later, on the eve of trial.").

The Special Master concludes that Canon's premise – that St. Clair "blocked" discovery – is not supported by the present record. Rather, the Special Master accepts St. Clair's view that Canon attempted to jam St. Clair by issuing 27 third-party subpoenas in one day. After agreeing to put off some of these depositions including that of Mirage to a later day, Canon again attempted to jam St. Clair by waiting until the end of the discovery period to renotice eight depositions, including that of Mirage.[15] The motions filed by St. Clair sought relief only from Canon's tactics with respect to timing. D.I. 307; D.I. 455 (motion by St. Clair seeking, *inter alia*, permission to reschedule the depositions following close of discovery, during April 13-30, 2004, at a time convenient to all counsel and witnesses).[16]

This Court has already rejected in another case an argument similar to that raised by Canon, that would switch the onus to St. Clair for Canon's failure to comply with its discovery obligations under the Federal Rules of Civil Procedure:

> Remarkably, [defendant] asserts that it should now be able to rely on those documents [it failed to produce] because [plaintiff] didn't seek to compel the extension of the deposition before. **That approach, of course, would put the onus for late production on the wrong party** and ignores the import of Federal Rule of Civil Procedure 37(c)(1), which provides that "[a] party that without justification fails to disclose information required [by the rules of discovery] is not, unless such failure is harmless, permitted to use as evidence at trial . . . information not so disclosed."

---

[15] *See* Findings of Fact for December 15, 2003 through March 12, 2004, *supra* at pp. 7-10.

[16] The Special Master does not conclude that St. Clair abstained entirely from its own gamesmanship. There is evidence that, while St. Clair's motion to permit the rescheduling of depositions to late April was pending, St. Clair refused Canon's efforts to reschedule the Mirage deposition. May 5, 2004 Declaration of Mark Baghdassarian, D.I. 535 at ¶ 12 ("Despite Canon's efforts to arrange the depositions of Mirage and Kodak at mutually convenient locations and times, St. Clair ultimately refused to proceed with these deposition."). Consequently, the Special Master has declined St. Clair's request for the reimbursement of certain fees and expenses. *See infra* p. 67, n. 20.

41

*Philips Electronics North America Corp. v. Contec Corp.,* No. Civ. A. 02-123-KAJ, *memo order* at * 1 (D. Del. Apr. 5, 2004) (Jordan, J.) [available as 2004 WL 769371] (emphasis added).

Finally, Canon argues that it was somehow prevented from supplementing its discovery responses because the matter was "before the Court." Once again the Special Master notes that at no time did Canon seek a protective order or other relief from the Court that would have excused it from its duty under Fed. R. Civ. P. 26(e) to supplement its discovery responses. The only matters before the Court concerning discovery of Mirage were:

- St. Clair's March 12, 2004 motion for a protective order that sought relief – in the form of rescheduling from March 29-30, 2004 to April 13-30, 2004 – eight deposition subpoenas issued by Canon, including one that would have renoticed the deposition of Mirage, D.I. 455, which was opposed by Canon;

- Canon's May 5, 2004 Motion to Proceed with the Taking of Two Outstanding Depositions of Mirage and Kodak ("Canon's Motion to Compel"), D.I. 533, which was opposed by St. Clair;

- St. Clair's July 28, 2004 letter to the Court requesting, in light of Canon's filing of the Ownership Defense Motion, that it be allowed to withdraw its opposition to Canon's Motion to Compel and that the depositions of Mirage be permitted to go forward, D.I. 625-26, which was opposed by Canon;

- St. Clair's August 2, 2004 letter to the Court requesting permission for St. Clair to depose (i) Mirage pursuant to Fed. R. Civ. P. 30(b)(6); and (ii) George Moussally and Kenneth Ford, the employees of Mirage who had submitted declarations in

42

support of the Ownership Defense Motion, D.I. 629, which was opposed by Canon; and

• Canon's August 30, 2004 motion for a protective order to prohibit St. Clair from pursing discovery of Mirage, D.I. 740.

The Special Master concludes that the Consulting Agreement, and the payments made to Mirage thereunder, would have been material to the Court's determination of each and every one of the issues before it that related to discovery directed to Mirage. Indeed, upon learning of the Consulting Agreement, the Court queried Canon as to why it didn't notify the Court of the Agreement:

> The Court: If the matter is before the Court, the minute you got this agreement, you should have told me about it. That is what –
>
> Mr. Daniel: No. What was before the Court at that time, your Honor, was the discovery motion, when this agreement was –
>
> The Court: You to take discovery of Mirage [referencing D.I. 533].
>
> Mr. Daniel: Right.
>
> The Court: And you get this agreement. Shouldn't you have told me about it?
>
> Mr. Daniel: We made the motion before we got the agreement, your Honor.[17]
>
> The Court: I understand. So the motion is pending.
>
> Mr. Daniel: Right.[18]

---

[17] The representations of Canon's counsel that its Motion to Compel (D.I. 533) was filed before the Consulting Agreement was executed is false. The record is undisputed that the Consulting Agreement was executed on April 30, 2004, and that Canon's Motion to Compel was filed on May 5, 2004.

[18] Again, Mr. Daniel's response to the question is false. See n. 17 *supra*.

062038.00610/40156788v.1

> The Court: You then get this agreement. Shouldn't you have told me about it? Forget [St. Clair]. How about me?
>
> There's a lack of candor with the Court. This is a significant agreement. This agreement trumps discovery of Mirage for anything you could have possibly been looking at, looking for. This agreement is much more important than taking discovery of Mirage.

D.I. 890 at 837:14-25 and 838:1-11. The Special Master concludes that, because Canon never told the Court about the existence of the Consulting Agreement until it belatedly gave a copy to St. Clair on September 30, 2004, after St. Clair had rested its case, nothing concerning – and nothing excusing – Canon's duty to supplement its discovery responses was "before the Court."

The Special Master therefore concludes that Canon has failed to provide any reasonable justification for Canon's abrogation of its discovery obligations under Rules 16, 26 and 37 of the Federal Rules of Civil Procedure.

## 2. Conclusion: Canon Engaged in Fraud on the Court

In the Findings and Order of the Special Master that issued to the parties under seal on March 15, 2005, the Special Master concluded that, based upon credible evidence, St. Clair had made a *prima facie* showing that Canon and its counsel had engaged in discovery fraud and fraud on the Court by failing to disclose and produce the Consulting Agreement and payments made to Mirage thereunder. Although St. Clair subsequently notified the Special Master that it did not intend to rely upon discovery fraud to support its request for sanctions, the Special Master has determined it to be critically important to address *sua sponte* the issue of fraud on the Court. The Special Master therefore examines that preliminary finding – only with respect to the issue of fraud on the Court – in light of the additional evidence marshaled by St. Clair during the Court-ordered discovery relating to the Consulting Agreement.

In Delaware, the elements of common law fraud are:

44

(a)     A misrepresentation or omission of a material fact;

(b)     An *intent* to deceive or a state of mind so reckless regarding consequences as to be the equivalent of intent (scienter);

(c)     A justifiable reliance on the misrepresentation; and

(d)     A injury to the deceived party resulting from the reliance.

*RCA Corp. v. Data General Corp.*, Civ. A. No. 84-270 JJF at \*2 (D.Del., Oct. 27, 1986) (Farnan, J.) [available as 1986 WL 15684].

### a.     Misrepresentation by Omission of a Material Fact

As set forth *supra* at pp. 3-5, the salient terms of the Consulting Agreement provide for a lump sum payment of $75,000 from Canon to Mirage, for Mirage's assistance and covenant not to sue. Additionally, Canon agreed to reimburse Mirage for its expenses, together with a $300 per hour consulting fee for "lost time" spent by Mirage employees in reviewing records and otherwise assisting Canon in providing support for the ownership defense. However, the potential benefit to Mirage under the Consulting Agreement is exponentially greater if Canon is successful in establishing that Mirage, rather than St. Clair, owns the rights to the patents-in-suit. As of September 30, 2004, St. Clair had successfully obtained infringement verdicts in excess of $60 million with respect to these patents, together with settlements in undisclosed amounts.

The Special Master concludes that the existence of the Consulting Agreement and consulting relationship between Canon and Mirage, the payments made to Mirage thereunder, as well as the potential benefits to be conferred upon Mirage based on the Court's determination of the ownership defense, are all highly material to the Court's consideration of such issues as witness bias, the reliability of Mirage's testimony and, ultimately, the admissibility of Mirage testimony to support the ownership defense. Accordingly, the Special Master concludes that the

45

Consulting Agreement should have been disclosed to the Court as material information in connection with Canon's Motion.

Additionally, the Special Master concludes that the existence and terms of the Consulting Agreement were also material to each of the motions that were pending before the Court relating to discovery of Mirage. First, the provisions of the Consulting Agreement that obligated Mirage to testify for, cooperate with and assist Canon are highly material to – and make unnecessary – relief sought by Canon's Motion to Proceed with the Taking of Two Depositions, I.D. 533. Second, the Consulting Agreement and the payments made to Mirage thereunder were highly material to the Court's consideration of whether St. Clair should be entitled to take discovery of Mirage in order to address the Ownership Defense Motion. The Court, unaware of the existence of the Consulting Agreement and payments to Mirage, denied these motions as moot. D.I. 782, 795, 804. Accordingly, the Special Master concludes that the Consulting Agreement and payments made to Mirage should have been disclosed to the Court as information material to the Court's determinations of these motions.

## b. Intent to Deceive/Reckless Disregard

The Special Master also concludes that examination of Canon's reasons for not disclosing or producing the Consulting Agreement and the payments made to Mirage thereunder, provide evidence of purposeful and intentional concealment by Canon.

First, the Special Master concludes that Canon purposefully failed to disclose the Consulting Agreement between its April 30, 2004 execution and Canon's filing of its Ownership Defense Motion on July 22, 2004, because Canon feared that if St. Clair learned of Canon's ownership defense strategy and Mirage's compensated cooperation, St. Clair would outbid Canon. *See* KLP 000004 (Canon's counsel advising Canon: "One fear we have is that St. Clair

46

may pay them for any rights [Mirage has] to circumvent this possible defense."). By keeping St. Clair in the dark about its consulting relationship with Mirage while Canon prepared its Ownership Defense Motion, Canon sought to reduce the perceived possibility that St. Clair would attempt to purchase Mirage's rights in the patents-in-suit and/or make Mirage a better offer for its cooperation in the litigation.

Second, the Special Master concludes that Canon purposefully failed to disclose the Consulting Agreement, even after filing the Ownership Defense Motion, because Canon intended that the Court decide the merits of its Motion without an opportunity to examine the integrity of the Mirage declarations supporting that Motion. This conclusion is supported by Canon's numerous communications to the Court between July 26 and August 3, 2004 that urged the Court – before St. Clair's responsive brief was even due – to give prompt attention to a summary disposition of the litigation based on Canon's Ownership Defense Motion, so that "this case can end now." D.I. 627. *See also* July 26 E-mail from Canon to the Court; and D.I. 628, 629. Further support is found in Canon's opposition to every attempt made by St. Clair to obtain discovery of Mirage after the Ownership Defense Motion was filed, D.I. 627 and 740. The Special Master concludes Canon's opposition to same was intended to improperly conceal the Consulting Agreement and Canon's consulting relationship with Mirage from the Court.

Third, the Special Master concludes that Canon waited until the last possible moment to finally produce the Consulting Agreement to St. Clair, that being during a recess in the midst of trial on September 30, 2004 after St. Clair had already rested its case in chief. The Special Master further concludes, based upon the testimony of Canon's counsel, that the only reason that Canon produced the Consulting Agreement at that time was because Mirage declarant George Moussally was about to take the stand for Canon, and Canon feared that St. Clair would uncover

47

the consulting relationship between Canon and Mirage during its cross-examination of Mr. Moussally in front of the jury. *See*, *e.g.* Bagdassarian Dep. at 77:11-13 ("We never – we never intended to introduce the exhibit – the consulting agreement at the trial.") and *id*. at 104:16-17 ("the agreement may come up in – in direct but more likely would come up in cross-examination.").

In addition to Canon's purposeful and intentional concealment of the Consulting Agreement and payments made to Mirage thereunder, there is sufficient evidence to conclude that Canon demonstrated a reckless disregard of its discovery obligations, to cite just a few examples:

- When Canon's lead counsel was asked during its deposition why it hadn't given a copy of the Consulting Agreement to St. Clair, its response was:

    > I **think** the parties understood that there would – **there may be at some point in the future** an omnibus supplementation   .   .   .   we would have an omnibus supplementation at some time in the future.  The problem is we never – we never – we never got there.  And I think with the benefit of hindsight, or I think we realized after the fact that you had made a conscious decision – you, St. Clair – had made a conscious decision not to pursue supplementation, so it just seemed to us that **there really was no responsibility at that point to turn over – to make any supplementation** of our response to that point.

    Bagdassarian Dep. at 27:19-25 to 28:1-8 (emphasis added).

- When asked about St. Clair's August 13, 2004 letter requesting supplementation of discovery, Canon's lead counsel admits that it considered this letter to be a request for "line-item" supplementation, Baghdassarian Dep. at 34:22-23.  Canon did not supplement, responding instead that Canon had "complied with our discovery obligations."  When asked if Canon had made a decision that it did not

48

have an obligation to supplement its discovery responses under Rule 26(e) to produce the Consulting Agreement, its counsel responded:

> [T]here was no decision regarding whether or not we had to – to supplement under Rule 26. We had raised and St. Clair had raised the issue before Judge Farnan at this point and I think both parties were looking to Judge Farnan for direction on how to – how to – how to resolve – resolve the motion to dismiss and how to provide equitable and fair two-way discovery.

Baghdassarian Dep. at 100:18-25 to 101:1-13.

- On September 20, 2004 – just one week before the start of trial – one of Canon's attorneys sent an e-mail to other members of the Canon trial team asking "Do we need to turn [the Consulting Agreement] over at this point? As I write the direct, we are going to have to mention it. So do we have to designate it as a trial exhibit or turn it over. Any thoughts?" That attorney later testified that he received no response to this e-mail from the other members of Canon's trial team. Baghdassarian Dep. at 103:3-25. He did not raise the issue again. *Id.* at 107:16-19.

Accordingly, the Special Master concludes that the requisite scienter is established by competent evidence that Canon purposefully intended to deceive the Court about the existence of the Consulting Agreement and its evidentiary value on the issue of Mirage's bias as a witness, because of the payments made to Mirage under the Agreement. Sufficient evidence also exists to conclude that Canon recklessly disregarded its discovery obligations under Fed. R. Civ. P. 26(e), as well as the consequences of its failures upon the Court and the scheduling and trial management orders for the conduct of this litigation.

c.      **Justifiable Reliance on the Misrepresentation**

Sufficient evidence exists for the Special Master to conclude that the Court justifiably relied upon Canon's misrepresentations and omissions.   In filing its Motion to Compel depositions of Mirage, D.I. 533, Canon fostered a perception that it required the Court's intervention in order to obtain Mirage's cooperation in the ownership defense.   Without disclosure of the Consulting Agreement and the payments made to Mirage thereunder – as well as of the future potential benefits to be conferred upon Mirage if the ownership defense succeeds – the Court did not know that Mirage had effectively been transformed from an unbiased third-party witness into one with a real financial stake in the outcome of the litigation.   Without this knowledge, the Court entered orders denying St. Clair's subsequent requests to take discovery of Mirage, discovery which may have uncovered the consulting relationship between Canon and Mirage and permitted Mirage's bias to be tested.

Similarly, Canon neither identified the Consulting Agreement among its trial exhibits, nor did it raise the existence of the Consulting Agreement with the Court during the pretrial conference at which the Court directed the parties "that there be no surprises" at trial.   Without knowledge of the issues the Consulting Agreement's belated production would raise, the Court issued orders with respect to the schedule and management of the trial.

Accordingly, the Special Master concludes that the Court relied directly upon the record in the case when issuing numerous orders and that, due to Canon's misrepresentations and omissions, that record was materially incomplete.   Based upon the special duty of candor owed by counsel to the Court, the Special Master also concludes that the Court's reliance upon Canon's misrepresentations and omissions was entirely justified.

### d.    Injury Resulting from the Reliance

During its September 30, 2004 colloquy with the Court, Canon argued that any prejudice

that resulted from its non-disclosure of the Consulting Agreement was the fault of St. Clair for

failing to file an appropriate motion at the time St. Clair first suspected – when Canon filed its

Ownership Defense Motion two months before trial – that Canon might have some sort of

agreement with Mirage.  D.I. 890 at 849:13-25 and 850:1-10 (Mr. Daniel:  "What [St. Clair has]

done with us is they purposely avoided bringing it to your attention so that they can then do

something now at trial to somehow keep it out . . . we pointed out further [in responding to St.

Clair's August 13, 2004 letter] that they were saying we're supposed to update discovery.  We

said [we] are not updating a whole series of discovery.").

In a very well-reasoned and eloquent decision, the Sixth Circuit considered and rejected a

similar argument made by a defendant that it did not have a duty to disclose a written statement

given by a third party witness:

> **The rules of discovery, however, do not permit parties to
> withhold material simply because the opponent could discover
> it on his or her own.**  Fed. R. Civ. P. 26.  It is clear that the
> Plaintiffs' interrogatories requested the specific information that
> was withheld in this case.  Defendants make no claim that they
> were unaware of this statement at the time discovery took place.
> And even if they did not have it at that time, they were **under a
> continuing obligation to supplement discovery.**  *Id.* at 26(e)
> . . . .
>
> **Our system of discovery was designed to increase the
> likelihood that justice will be served in each case, not to
> promote principles of gamesmanship and deception in which
> the [party] who hides the ball most effectively wins the case.
> What happened in this case is a clear example of how bad faith
> during discovery can lead to further misconduct . . . They show
> contempt for the rules of discovery and violate the trust placed
> in counsel to obey the fundamental rules of court.  In doing so,
> counsel prevented the Plaintiff from fully and fairly presenting
> their case.**  We therefore agree with the District Court that the

51

> Plaintiffs presented a valid basis for obtaining relief from judgment
> under Rule 60(b).

*Abrahamsen v. Trans-State Express, Inc.*, 92 F. 3d 425, 428-29 (6th Cir. 1996) (emphasis added).

Accordingly, the Special Master concludes the fault is Canon's, and that the Court suffered injury directly as a result of its reasonable reliance on Canon's misrepresentations and omissions. Because the *Poulis* analysis also examines that injury – in the context of the "prejudice" suffered – as discussed in depth *infra* at pp. 61-62, the Special Master will not repeat it here.

In sum, the Special Master concludes that, with the benefit of information discovered by St. Clair during the Court-ordered discovery, the Special Master's preliminary finding that St. Clair had made a *prima facia* showing fraud on the Court has ripened into a conclusion supported by credible evidence.

### 3.     Conclusion:  Canon Exhibited a Lack of Candor During the Court's Investigation

As a final point in assessing Canon's willfulness and/or bad faith in failing to timely disclose and produce the Consulting Agreement and the payments made to Mirage thereunder, the Special Master examines evidence that Canon displayed a lack of candor (i) during the Court's inquiry into whether and why Canon failed to timely disclose and produce this information; and (ii) during the discovery ordered by the Court to proceed under the auspices of the Special Master.

First, the Special Master turns to the transcript of the colloquy that took place between the Court and Canon's counsel following Canon's production of the Consulting Agreement to St. Clair on September 30, 2004. St. Clair immediately brought the matter to the attention of the Court, and requested that Canon's ownership defense be stricken from the case as a sanction for what St. Clair perceived as discovery fraud. D.I. 890 at 829-30:1-12.

52

The Court attempted to question Canon's counsel, through John Daniel, Esquire, about how the Consulting Agreement came into existence, why it was not disclosed to St. Clair, and why it was not disclosed to the Court itself.  Because Canon's counsel did not satisfactorily respond to the Court's questions, the Court ordered full briefing on St. Clair's motion to dismiss the ownership defense, as well as discovery before the Special Master.  This interrupted the trial on the ownership defense, necessitating a separate trial if the ownership defense is permitted to go forward.

With the benefit of the Court-ordered discovery conducted by St. Clair, the Special Master concludes that Canon's counsel displayed a lack of candor to the Court during the September 30, 2004 colloquy and notes the following as just several examples:

- In response to the Court's question of whether Canon or its counsel brought up the idea for the Consulting Agreement, John Daniel, Esquire, responded "To tell you the truth, I'm not sure, your Honor," D.I. 890 at 940:23-25 to 841:1-3.  Mr. Daniel was listed as an author or recipient of 18 of the 27 communications or documents identified on Canon's privilege log as relating to the Consulting Agreement during the period leading up to its execution date, including communications that make clear that Canon's counsel suggested the idea.  In his deposition conducted by St. Clair, Mr. Daniel admitted that he himself met with Canon in Japan in early March 2004 and had the "initial communications" about the possibility of Canon and Mirage entering into an agreement.  Daniel Dep. At 8:8-25 to 9:1-14.

- The Court also questioned Canon about the propriety of its payment of $75,000 to Mirage under the Consulting Agreement.  D.I. 890 at 841:11-22 (The Court: "I

know that's not a lot of money to lawyers that litigate patent cases, but to a witness, you paid him $75,000. My interpretation would be possibly . . . you paid the guy $75,000 to show up and say he owns the patents . . . it sounds like you paid him $75,000 to come and say what you wanted."). Canon's counsel did not advise the Court that the actual amount it had already paid (or owed) to Mirage as of that date was $167,693.97 – more than twice the amount over which the Court had expressed concern. KL 000153-159.

* When the Court questioned why Canon didn't notify the Court about the Consulting Agreement when it filed its Motion to Proceed with the Taking of Two Depositions, D.I. 533, Canon's counsel responded that "We made the motion before we got the agreement, Your Honor." D.I. 890 at 837:14-25 to 838:1-11. As set forth *supra* at p. 43, n. 17, Canon's representation was false because the Consulting Agreement was executed on April 30, 2004 and Canon's Motion was filed on May 5, 2004. This was not simply a point of confusion because there is evidence that the filing of the Motion was strategically timed by Canon's counsel to follow the execution of the Consulting Agreement. April 19, 2004 E-mail from Mark Baghdassarian to Hideki Sanatake (Canon, Inc.) at KLP 000012 (discussing possible motion to compel deposition of Mirage and stating "we would like to have [the Consulting Agreement] in place before we file such a motion.").

Accordingly, the Special Master concludes that Canon exhibited a lack of candor to the Court in responding to the Court's questions and that this lack of candor necessitated, at a minimum, the need for discovery before the Special Master to assist the Court in understanding the factual circumstances required for its consideration of St. Clair's request for sanctions.

062038.00610/40156788v.1

Second, the Special Master concludes that there is evidence that Canon's lack of candor continued even during discovery before the Special Master. For example, one issue before the Special Master was why Canon filed its May 5, 2004 Motion to Proceed with the Taking of Two Depositions, D.I. 533, including a deposition of Mirage, when Canon had unparalleled access to Mirage's testimony, documents and cooperation under the terms of the Consulting Agreement.

Canon asserted in its January 31, 2005 briefing before the Special Master that it sought these depositions for the purpose of overcoming St. Clair's hearsay objections to the declarations by Mirage employees that supported Canon's Ownership Defense Motion. The record, however, suggests otherwise. First, Canon's May 5, 2004 moving papers do not state this reason. Rather, Canon's briefing in support of its Motion to Compel includes the following reasons:

> Canon seeks to take the Subject Depositions for compelling reasons. Canon learned that Mirage, not St. Clair, is the true owner of the patents in suit. Kodak had developed, displayed, marketed and sold a camera product that Canon believes invalidates the patents-in-suit. Accordingly, Canon first noticed the Mirage and Kodak depositions for January 15 and 16, 2004, respectively, and . . . thereafter agreed with St. Clair to postpone the depositions until mutually acceptable dates could be determined. However, these depositions, as with many other depositions in this case, had not yet been taken when the March – the last month available to take depositions – arrived. . . .

D.I. 533 at p.2 (citations omitted).

Second, Canon could not have relied on the reason it gave to the Special Master in its January 31, 2005 submission (the need to meet St. Clair's hearsay objections) since Canon's Ownership Defense Motion was not filed until July 22, 2004 and St. Clair's Memorandum of Law in Opposition to same – raising the hearsay objections – was not filed until August 5, 2004, three months **after** Canon had already filed its May 5, 2004 Motion to Compel. *Compare* dates of D.I. 533 *with* D.I. 631-38. Third, in its May 10, 2005 deposition, Canon's lead counsel

described a totally different rationale. Canon wanted Mirage's deposition testimony in case

Mirage did not testify at trial:

> Kramer Levin: We believed Mirage discovery was relevant. We further believed that a deposition was necessary because as we proceeded to trial we didn't have any assurance on May 5 that we – we would have testimony from Mirage.
>
> St. Clair: Well you –
>
> Kramer Levin: It was up to Judge Farnan.
>
> St. Clair: Well you had an agreement signed before May 5 that obligated Mirage to assist you, and that assistance included providing testimony providing testimony in court; correct?
>
> Kramer Levin: It did – The agreement does indicate that they had an obligation to provide testimony in court, but I think you'll recognize, Mr. Schutz, that if Mirage, for example, had other obligations that they needed to meet for one or more reasons and could not be available during the exact time of our trial or on the very day that we needed their testimony, then we – we would be in a difficult situation at that point.

Baghdassarian Dep. at 39:15-25 to 40:1-9.

Canon's lack of candor is also illustrated by the deposition transcripts of its counsel. For example, Canon's lead counsel – the law firm of Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") – selected as its Rule 30(b)(6) deposition designee Mark Baghdassarian, a mid-level associate. This selection is curious given that at least two Kramer Levin partners led Canon's trial team. Moreover, the Special Master concludes that Mr. Baghdassarian's deposition transcript, when read in its entirety, is a case study in non-responsiveness. As just one example, the Special Master offers the following excerpt:

> St. Clair: In other words, was there a conscious decision prior to September 30th that we're not going to

produce this agreement because we've got all these motions pending before the court?

Kramer Levin: Well I think that – That's the problem I have with your question, Mr. Schutz, is it – it assumes a conscious decision not to produce the agreement. I think we – we got a point in time of July '04 where we fully expected for Judge Farnan to give us direction, and that would allow for this – for this agreement and – and other documents to possibly come to light.

St. Clair: Let's go back because I'm not sure I got a complete answer to –

Kramer Levin: Okay.

St. Clair: – my question about whether anyone suggested that this agreement should have to be produced. Were there any writings in any memo other than this e-mail that you talked about?

Kramer Levin: Were there any writings that specifically said we should produce this agreement?

St. Clair: It doesn't have to be that specific.

Kramer Levin: Okay.

St. Clair: Look, were there ever any discussions, writing, in-person, prior to September 30th along the lines of this agreement relates to the patents and it relates to the lawsuit, maybe we have a duty to produce it, were there any discussions at all along those lines?

Kramer Levin: I think the – the discussions that occurred, and I think if any discussions occurred it would be mainly in – in August of 2004, and what – what those – those related to is when we – when we received from St. Clair this line-item request, our discussion there was at that point, well, it's a – it's pretty straightforward, the issue is pending before Judge Farnan, let's wait for Judge Farnan's direction on this. St. Clair had made requests of Judge Farnan, we had made requests of Judge Farnan, and ultimately, as you know, Mr. Schutz, Judge Farnan denied us all any discovery related to Mirage.

57

St. Clair:      Let's back up a second. So the line item came in from St. Clair and there was a conscious decision by Kramer Levin not to produce the agreement at that time because motions were pending before Judge Farnan; is that your position?

Kramer Levin:  I don't – I don't think you have that quite right, Mr. Schutz.

St. Clair:      Well tell me how it worked.

Kramer Levin:  I think – that's – That's just what I explained to you, and you're characterizing it a certain way, so I'm – I'm not sure I can add more to my answer.

St. Clair:      Well let's back up and unpack it.

Kramer Levin:  Okay.

St. Clair:      In August there was a line-item request by St. Clair that encompassed this consulting agreement and covenant not to sue; correct?

Kramer Levin:  In August of 2004 there was a line-item request from St. Clair, that's correct.

St. Clair:      And it – it specifically was a line item that encompassed this consulting agreement and covenant not to sue; correct?

Kramer Levin:  I believe that's correct, yes.

St. Clair:      And the agreement was not produced at that time; correct?

Kramer Levin:  The agreement – the agreement – If you're asking whether we handed – we handed over the agreement to St. Clair at that time, you're correct, we obviously did not at that time.

St. Clair:      And –

Kramer Levin:  Because I think, as I explained to you, at that point in time it was a relatively straightforward discussion here at Kramer Levin regarding that the issue was before Judge Farnan and St. Clair was really seeking unilateral Mirage discovery and we believed – we looked for direction from Judge

58

> Farnan to get fair and equitable two-way discovery, if you will.

St. Clair:     Did you – Did Kramer Levin make the decision that that August 2004 letter from St. Clair did not trigger a duty to supplement under Rule 26(e) by producing this consulting agreement and covenant not to sue?

• • •

Kramer Levin:     Again, Mr. Schutz, I think we've probably gone over the same question probably 10 times already I think the – the answer is that at the time **the issue concerning Mirage discovery, including this agreement, was really squarely before Judge Farnan** with our letters asking for a conference to discuss logistical issues including discovery, including St. Clair's request for permission to proceed with Mirage discovery. I think all of those issues were squarely before Judge Farnan and I think both parties at that point were looking for guidance from Judge Farnan on how to proceed.

Kramer Levin:     Do you mind if we take a quick break?

Baghdassarian Dep. at 50:12-25 to 54:1-9 (emphasis added). As previously discussed, *supra* at pp.5-6, the Court was unaware of the existence of the Consulting Agreement. Therefore, the testimony of Canon's counsel that "the issue concerning Mirage discovery, including this agreement, was really squarely before Judge Farnan" and required Canon to await direction from the Court is, in the Special Master's view, simply not so.

In sum, the Special Mast concludes (i) that Canon's failure to timely disclose and produce the Consulting Agreement, and the payments made to Mirage thereunder, was not justified; (ii) that Canon's purposeful failure to timely disclose and produce this information was intended to, and did, effect fraud on the Court; and (iii) that Canon has exhibited a lack of candor to the Court in an attempt to conceal its misconduct. Accordingly, the Special Master therefore concludes

59

that Canon has demonstrated more than "flagrant bad faith" and a callous disregard of its responsibilities to St. Clair and the Court such that the "willfulness/bad faith" factor weighs strongly against Canon.

## D. Special Master's Conclusions Regarding *Meritoriousness*

An additional *Poulis* factor to be assessed is the "meritoriousness" of the claim that would be dismissed by the proposed sanction. "A claim, or defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would constitute a complete defense." *Poulis*, 747 F.2d at 869-80; *followed*, *Beneville v. Pileggi*, No. Civ. A. 03-474 JJF slip. op. at *2 (D. Del. Jul. 19, 2004) (Farnan, J.) [available at 2004 WL 1631354].

In this case, St. Clair requests the dismissal of Canon's ownership defense. At the pre-trial conference on September 16, 2004, the Court declined to dismiss St. Clair's claims against Canon based on the ownership defense, clearly rejecting Canon's argument that the Court does not have jurisdiction over this matter. D.I. 812. The Court did, however, allow that the central ownership issue raised by the Ownership Defense Motion – whether Mirage is the true owner of the patents-in-suit – would be scheduled for trial on the merits following Canon's infringement trial. D.I. 818 at 26:7-12.

Accordingly, the Special Master need not revisit the Court's prior analysis that the ownership defense has at least sufficient merit to be heard and, therefore, concludes that the "meritoriousness" factor weighs in favor of Canon. In so concluding, the Special Master does not determine that Canon would prevail at a trial on the merits of the ownership defense, merely that the defense would be a complete defense as to St. Clair if Canon prevailed at trial.

60

**E.      Special Master's Conclusions Regarding *Prejudice* to St. Clair and the Court**

Another *Poulis* factor to be considered is that of the "prejudice" caused by Canon's failure to comply with its discovery obligations. In its assessment of this factor, the Special Master considers prejudice to both St. Clair and the Court.

On the present record, the Special Master concludes that Canon's failure to timely disclose the Consulting Agreement to St. Clair deprived St. Clair of an opportunity to take the discovery necessary to assess witness bias and the reliability of Mirage's testimony, severely prejudicing St. Clair's preparation for a trial that was scheduled to include the ownership defense. D.I. 890 at 836:17-20 and 837:1-3 (The Court: "[St. Clair] would have been entitled to a whole lot of discovery against Mirage not only on the agreement and the relationship and the negotiation, but even far beyond that . . . [W]hat about the prejudice to [St. Clair?] . . . It's huge . . . .").

Additionally, Canon's untimely production of the Consulting Agreement in the midst of its infringement trial disrupted presentation of the ownership defense during that trial. D.I. 890 at 855:6-8 (The Court: "So ownership is out of this trial, not at this point out of the case, and I'm going to have [the motion to strike it] presented by full motion."). If the Court permits the ownership defense to go forward, it must do so at another trial yet to be scheduled. The Special Master concludes that this has greatly prejudiced St. Clair, by delaying the entry of final judgment on St. Clair's $34.7 million jury verdict against Canon.

The prejudice to the Court and judicial system are palpably greater. The Special Master concludes that Canon unfairly misused the Court's resources by filing an unnecessary Motion to Compel depositions of Mirage. Canon's belated production of the Consulting Agreement burdened the Court's already busy docket by disrupting trial on the ownership defense issue, requiring a separate trial if that defense were permitted to go forward. The interests of justice

required further imposition on the Court's time by necessitating that the Court address the discovery and sanctions urged by St. Clair. The resulting injury is not only to the Court, but to those other individuals who must bring their disputes before the Court's already overburdened docket.

Importantly, the prejudice to St. Clair and the Court has not ended. Notwithstanding the considerable expenditure of time, money and resources necessitated by Canon's failure to date, the fact remains that St. Clair has not yet had an opportunity to take discovery of Mirage regarding the facts alleged to form the basis of the ownership defense. If the defense were permitted to go forward, that discovery must proceed as well. This would necessarily impose further burden on both St. Clair and the Court, including the burdens resulting from the mere passage of time on the task of discovery.

Accordingly, the Special Master concludes that the "prejudice" factor weighs strongly against Canon.

## F.    Special Master's Conclusions Regarding Available *Sanction Alternatives*

The final *Poulis* factor – an analysis of "alternative sanctions" – examines the effectiveness and availability of other sanctions. The Special Master concludes that the effectiveness of any alternative sanction must be examined against the following objectives: (i) to eliminate or, at least, substantially ameliorate the prejudice to St. Clair and the Court caused by Canon's untimely disclosure and production of the Consulting Agreement; (ii) to punish Canon for its abrogation of its discovery obligations, and ensure that it does not engage in similar conduct in the future; and (iii) to deter others from engaging in similar discovery violations.

Against these objectives, the Special Master has considered the following alternatives:

• **Disciplinary Action Against Canon's Attorneys** – Attorneys admitted to practice *pro hac vice* before this Court do so "at the pleasure of the court." D. Del. L. Civ. R.

83.5(c). Accordingly, it is within the authority of the Court to revoke the *pro hac vice* admissions of Canon's lead counsel. *See, e.g., In the Matter of the Complaint of PMD Ent.*, 215 F. Supp. at 529-30 (revoking *pro hac vice* admission of attorney who offered to pay a fact witness $100 an hour for the witness' time in reviewing documents over a two week period).

The Special Master concludes that the effectiveness of such revocation is, however, limited. Because this sanction is prospective in nature, it ensures only that the Court need not suffer further involvement by attorneys who have exhibited a callous disregard for the Court's rules. This alternative does nothing, however, to compensate St. Clair and the Court for the great and substantial prejudice they have already suffered.

•   **Monetary Sanctions Against Canon and/or Its Counsel** – It is also within the Court's discretion to require, as sanction under Fed. R. Civ. P. 16, 26, 37 and 28 U.S.C. § 1927,[19] that Canon and/or its counsel reimburse St. Clair for its attorney fees and expenses with respect to addressing Canon's unnecessary Motion to Compel, as well as all discovery before the Special Master. *See, e.g., Tracinda Corp. v. DaimlerChrysler AG*, No. Civ. A. 00-993-JJF, *memo op.* at *2-3 (D. Del. Apr. 20, 2005) (Farnan, J.) (awarding $556,061 in sanctions against a party which did not intentionally or in bad faith withhold relevant documents from production, but where the failure to produce nonetheless resulted in substantial costs to its opponent and delay to the trial management schedule); *TA Instruments, Inc. v. The Perkin-Elmer Corp.*, 277 F. Supp. 2d 367, 379 (D. Del. 2003) (assessing $25,000 sanction against defendant for discovery abuse by failing to timely disclose evidence of post-trial sales in connection with willful infringement, with $12,500 payable to reimburse plaintiff for its attorneys' fees in pursuing discovery of post-

---

[19] 28 U.S.C. § 1927 provides that:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

infringement sales). Pursuant to these same provisions, the Court may also require payment of monetary sanctions to the Court, to compensate for the waste of its time and resources as a result of Canon's discovery abuse and failure to comply with the Court's Scheduling Order. *See, e.g., TA Instruments* (assessing S12,500 as sanctions to be paid to the court "for the wasted time and resources of the court.").

The Special Master concludes that the effectiveness of monetary sanctions is also limited. Although such sanctions would, in part, ameliorate some of the prejudice to St. Clair and the Court, sanctions in the form of attorney fees and expenses would not offset the future prejudice to St. Clair and the Court necessitated by the reopening of discovery, a new trial on the ownership defense, and – if St. Clair prevails at trial on the ownership defense – the further delay in reducing St. Clair's verdict against Canon to a final judgment. On the other hand, if Canon prevails at any trial on the ownership defense and is successful in defeating St. Clair's \$34.7 million judgment against it, Canon would be handsomely rewarded in the wake of its misconduct and no amount of monetary sanction would be effective in deterring future misconduct by Canon or others.

• **Dismissal of Ownership Defense** – In considering the final alternative, the dismissal of Canon's ownership defense pursuant to Fed. R. Civ. P. 16, 26 and 37 – as specifically requested by St. Clair – the Special Master is informed by the reasoning of another court:

> The dismissal of an action or entry of a default judgment as a sanction for discovery abuse should be imposed only if there is a deliberate or bad faith non-compliance which constitutes a flagrant abuse of or disregard for the discovery rules. **Sanctions must be tailored to the severity of the misconduct,** and dismissal of an action or entry of default judgment should be used sparingly, only in extreme situations, and should not be used if an alternative, less drastic sanction is available and would be just as affective.

> **Although the law favors resolution of disputes on the merits, that consideration must be balanced against the need to deter discovery abuses, promote efficient litigation, and protect the interests of all litigants. Therefore the most severe sanctions must be available, not only to penalize those whose conduct is deemed to warrant those sanctions, but also to deter those who might be tempted to abuse the discovery process.**

*Vorachek v. Citizen's State Bank of Lankin*, 421 N.W. 2d 45, 50-51 (N.D. 1988) (emphasis added).

The egregious nature of Canon's misconduct with respect to the concealment of the Consulting Agreement and the payments made to Mirage thereunder from St. Clair and the Court warrant dismissal of Canon's ownership defense. However, even this most severe form of sanction would not undo the prejudice suffered by St. Clair and the Court. Dismissal would, however, better serve the objectives of punishment and deterrence than any other alternative sanction. Unlike the other sanction alternatives, dismissal would also relieve St. Clair and the Court from further discovery, from trial on the ownership defense, and from further delay in reducing St. Clair's infringement verdict against Canon to final judgment.

Accordingly, the Special Master concludes that the "alternative sanctions" factor weighs against Canon because none of the alternative sanctions available would be nearly as effective as dismissal in meeting the stated objectives.

## CONCLUSION

The Special Master hereby concludes that analysis of the *Poulis* factors weigh strongly in favor of granting St. Clair's request for dismissal of the ownership defense. Specifically, the Special Master concludes that examination of (1) Canon's personal responsibility; (2) the prejudice to St. Clair and the Court caused by Canon; (3) Canon's history of dilatoriness; (4) the willfulness and bad faith evidenced by Canon's conduct; and (5) the ineffectiveness of sanctions

other than dismissal, all weigh against Canon. Only the possible meritoriousness of the ownership defense weighs in favor of Canon.

Moreover, the Special Master concludes that dismissal of the ownership defense alone does not satisfy all of the objectives identified by the Special Master in considering this matter. The Special Master therefore additionally concludes – as also requested by St. Clair – that additional sanctions should be ordered to remedy the prejudice to St. Clair and the Court, punish Canon for its abrogation of its discovery obligations and ensure that it does not engage in similar misconduct in the future, and deter others from engaging in similar discovery violations.

## A.   Sanctions Recommended

Accordingly, the Special Master recommends the imposition of the following civil sanctions against Canon and/or its counsel:

(1)   that, pursuant to Fed. R. Civ. P. 16, 26 and 37, the ownership defense be dismissed and Canon hereafter be precluded from raising the ownership defense, as set forth in D.I. 612-616, with respect to any patent infringement claims asserted by St. Clair regarding the patents-in-suit;

(2)   that, pursuant to Fed. R. Civ. P. 16, 26 and 37 and District of Delaware Local Rule 83.5, the *pro hac vice* admissions of Canon's attorneys from the law firm of Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") – specifically those of John Daniel, Donald Rhoads, Mark Baghdassarian and Vito DeBari – be immediately revoked, and that other attorneys from the law firm of Kramer Levin be precluded from representing Canon in any further proceedings before the Court in this matter;

(3)   that, pursuant to Fed. R. Civ. P. 16, 26 and 37, Canon and Kramer Levin be responsible, jointly and severally, for reimbursing St. Clair for its reasonable

66

attorney fees and expenses associated with (a) St. Clair's response to Canon's Motion to Proceed with Taking Two Outstanding Depositions filed May 5, 2004 [D.I. 533]; and (b) all discovery and proceedings before the Special Master, including reimbursement of St. Clair's *pro rata* share of the Special Master fees;[20]

(4)  that St. Clair **not later than November 30, 2005** submit to the Special Master, by affidavit, and serve Canon with a summary of, the unreimbursed expenses and attorney fees for which it seeks reimbursement pursuant to subparagraph (3) above, in detail sufficient to permit assessment of the reasonableness of such costs, with the exception that detail that would implicate either the attorney-client or work product privilege may be submitted for *in camera* review;

(5)  that Canon and Kramer Levin, jointly or severally, pay all amounts due as sanctions under subparagraph (3) above to St. Clair within thirty (30) days of a determination by the Special Master that the amounts for which St. Clair seeks reimbursement are reasonable;

(6)  that Kramer Levin pay to the Court (a) a sanction in the amount of Ten Thousand Dollars ($10,000.00) to reimburse the Court for its administrative costs in connection with Canon's violation of 28 U.S. C. § 1927 and Fed. R. Civ. P. 11 for filing in bad faith the unnecessary motion docketed at D.I. 533; and (b) an additional sanction in the amount of Twenty-Five Thousand Dollars ($25,000.00), pursuant to Fed. R. Civ. P. 16, 26 and 37, to reimburse the Court for its administrative costs in connection with the interruption of the trial on the ownership defense, the delay in reducing the verdict in favor of St. Clair to final

---

[20] The Special Master hereby rejects St. Clair's request for reimbursement of the additional activities designated in subparagraphs (1) and (3)-(8) *supra* at p.18, since those activities derive from the parties' strategic decisions to block or seek depositions of Mirage at various points in the litigation.

67

062038.00610/40156788v.1

judgment and the continued pendency of this case, all of which resulted from the failure to comply with its discovery obligations and the Scheduling Order of this Court; and

(7)     that Kramer Levin pay all amounts due as sanctions under subparagraph (6) above to the Court within thirty (30) days.

**The Special Master's Report and Recommendations will become a final order of the Court after the Special Master has ruled on the reasonableness of the amount of the reimbursement sought by St. Clair as sanctions, unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g).**

ENTERED this
17th day of November, 2005.

Vincent J. Poppiti  (DSBA No. 100614)
Special Master